McCabe, J.
The appellant was indicted in the Hendricks Circuit Court for murder in the first degree in the alleged killing of his wife, Thurza Hinshaw, in the county of Hendricks, on the 10th day of January, 1895. He was put upon the trial of said charge before a jury on September 4, 1895, which was concluded on October 12th, nest thereafter, resulting in a verdict finding him guilty of murder in the second degree, and prescribing his punishment therefor at imprisonment in the State prison during his life. Afterwards the court rendered judgment on the verdict, sentencing the appellant to imprisonment for and during his natural life. The appellant assigns for error in this court only the action of the circuit court in overruling his motion to quash the indictment and in overruling his motion for a new trial. The first ground of alleged *337 error is abandoned and waived by the appellant in not mentioning in his blief, or oral argument, the subject of the sufficiency of the indictment, or the action of the trial court in refusing to quash it. A large number of specifications of error are named in the.motion for a new trial as ground therefor; all of such alleged errors that are pointed out and argued in appellant’s brief, we will notice as we proceed. The first ground of the motion for new trial presented in appellant’s brief, and the first in importance of all the questions presented by the record and briefs, is the forty-fourth, which is the last ground specified in the motion for a new trial, namely, that the verdict is contrary to the law and the evidence. Under this specification the only contention of appellant’s learned counsel is that the evidence is insufficient to support the verdict. As to the killing of Mrs. Hinshaw, at the time and place charged, there is no controversy whatever. But as to who killed her the evidence is all circumstantial. And upon this point the learned counsel for appellant say: “And here our first proposition is, that, were we to concede as actually established against the appellant every fact from which it is claimed that the inference of guilt could arise as to which there was any evidence whatever, and to consider as established in his favor only such facts as to which there is absolutely no conflict in the evidence, that acting upon this hypothesis, the facts thus considered as established do not exclude every reasonable hypothesis of the innocence of the appellant. But upon the contrary, taking all the facts included in such hypothesis as actually existing, it is in the highest degree unreasonable to suppose that the appellant did maliciously kill and murder his wife. That there are other theories as to how she came to her death more reasonable than the theory that he murdered her.” Briefly stated the known circumstances *338 of the killing are in substance as follows: The appellant was born and reared on a farm in Randolph county,in this State. After he reached 21 years of age he taught school in winter and farmed, or helped his father farm, during the summer season. On February 24, 1887, he was married in that county to Thurza Oiler, who had been reared upon a farm in said county, and whom he had known since he was 13 years old. He continued to reside in Randolph county, thus occupied, until the fall of 1.892, when he removed to the town of Belleville, in Hendricks county, and for two years taught the public schools there. In September, 1894, he entered the ministry of the Methodist Episcopal church, and was assigned to the Belleville circuit as such minister, and continued to preach therein until the time of the death of his wife on January 10, 1895. A great number of witnesses who had known him and his wife intimately, including her mother, brothers, and sisters, his father and mother and their neighbors, testified without exception to the uniform happiness of their married life, their constant kindness, courtesy and apparent affection for each other. Appellant’s circuit included the charges of Belleville', Cherry Grove, Stilesville, and Salem. On the Sunday preceding January 10, 1895, he began a “protracted meeting” at Cherry Grove. Appellant preached on Sunday night and returned to his home in Belleville, his wife being with him. On Monday night he drove to Cherry Grove, preached, and again drove home, his wife accompanying him. On Tuesday night he and his wife again drove to Cherry Grove, he preached and they stayed all night with one of the members of his church, remaining in that neighborhood during the next day, and he preached again on Wednesday night of January 9,1895. After the services were over, some of the members of his church invited him to remain *339 with them; he referred the matter to his wife, who decided they must go home because of certain household duties devolving upon her. Up to this time he stood in high esteem with the members of his various congregations, and was successful in his work in the ministry. His wife likewise stood high in said congregations. After getting home Wednesday night, the 9th, they sat and talked some time. At about the hour of 1 o’clock in the night pistol shots were heard byvarious neighbors in the town; many of them came running to appellant’s residence within a few minutes. When they arrived at the house they found appellant’s wife lying at the back door of the house with a wound from a pistol ball, which had penetrated her skull upon one side and passed, through the brain, and had broken the skull from within on the opposite side of her head, and rested there between the skull and the scalp. The defendant was first seen across the street extending north and south past his house, or on the east side of the street opposite to his house; he was- in his night clothes and bare footed; his house is on the southwest corner, where a street called the “National Road” extending east and west past the front of his house, crosses the street first mentioned at right angles. Immediately, or very soon, after the shots were heard cries of murder and distress were heard by the neighbors in the village, who had been aroused from their slumbers by the shots. Those who lived near enough, and immediately looked out, saw him on the opposite side of the street east from his house as before mentioned. He was seen by them to pass north until he came to the south side of the National Roadstreet, and then turned to the west on the south side of that street, and passed his house,and was found by the neighbors lying on the ground some 30 or 40 feet west of his front gate. He kept up the cries of murder and calling *340 for help until the neighbors came to him. On examination it was found he had been twice shot, and cut a great many times, from which wounds he was slightly bleeding. He was at once carried into his house and a surgeon sent for to dress his wounds. And he gave an account to the highly excited neighbors, how he claimed it all happened. He stated that shortly before 1 o’clock in the night he was aroused from his sleep by a pistol shot, and that immediately his wife, who was in the same bed with him, uttered a cry of distress, saying: “Oh, I am shot, did you shoot me, Will?” And that the pistol ball wound found in her head was made by that shot. And thereupon he saw two unknown men in the room, whereupon he sprang out of bed; immediately on getting out of bed a pistol was again fired and that he felt a stinging sensation. He claimed that the stinging sensation spoken of was produced by the first pistol ball wound that was inflicted on him. His statement was that he immediately grappled with one of the strange men in the room, whereupon a most extraordinary struggle ensued. That his wife got up and engaged' in a struggle with the other man and at one time while the struggle was going on between him and what he claimed was the low heavy set man of the two, his wife came to him and, as some of the witnesses have it, put her arms around his neck and said: “Will is this you?” and, as others say, his statement was that she laid her hand on his arm and said: “Will is this you?” That the struggle between him and the man continued around and through that room and through the door out into the sitting room adjoining that on the east, and through that room and from that into the dining room on the south of that, and back into, the sitting room and from that back into the dining room, and from that into the kitchen south of the dining room, and from that out *341 into the back yard, and from there out of the east side gate into the street extending north and south past the east side of his house, and from there the struggle continued across the street to the east side thereof where he .was first seen that night by his neighbors. And just .as he got his man nearly to Dr. Tincher’s fence, across which he intended to break the man’s back, the other man who was taller and slimmer, at that juncture came up and shot the appellant again. He claims that he thereupon immediately became unconscious and fell down on the ground and in a short time revived so that he was able to arise, make the out-cries already spoken of, and walked to the place already mentioned, where his neighbors found him lying on the frozen ground over which there was a slight fall of snow that came that night. There was moon light coming through the rifts of clouds flying that made it quite light. He stated that when he was shot by the tall man and fell down, and became unconscious, that the two men ran off south. The neighbors without exacting any explanation from him as to how an unconscious man could tell which way the slayers of his wife and the attempted slayers of himself had gone, at once instituted a vigilant search for the alleged murderers tracks in the fresh fallen snow in the direction indicated by him and in all directions, but not the slightest trace could be found of the fleeing criminals, if any had fled from the scene of that shocking tragedy that night. Nor did he offer any explanation how these alleged criminals could have run, away from the scene of their bloody deeds to the south, or in any other direction without making any tracks.in the fresh fallen snow, or without leaving some trace of their going. This is only an outline of the substance of his various accounts given in conversation that night and at other times to those with whom he talked on the subject, *342 and also his statement to the coroner’s jury and to the grand jury under oath. The appellant was not a witness on the trial, though Ms various accounts of the tragedy were put in evidence by the State in the testimony of witnesses to whom and in whose hearing he had talked.
The theory of the defense as stated by his counsel in the brief is: “That the appellant and his wife had retired for the night and both had gone to sleep. They occupied the west front room of the house. The bed stood in the southwest corner of the room, the head to the west and near to the west wall; the back side of the bed near to or against the south wall; the appellant’s wife occupied the back part of the bed; that after the appellant and his wife had gone to bed, and fallen to sleep, burglars came into the house and into the room, and when near the bed, by some noise or otherwise, aroused the appellant’s wife, when she started up in bed with some exclamation of fright, which partially aroused appellant, when one of the burglars fired a pistol at her, inflicting the wound above described, which more fully awakened the appellant; that he thereupon discovered two men in the room and he at once sprang up and started to get out of bed, at which instant he was shot the first time, the bullet striking him on the left side passing along one of the ribs, making a flesh wound; that he grappled with one of the men, and a scuffle ensued out of this room, into the room next adjoining upon the east, thence into a room to the south of that, thence into a room still to the south of that, thence into a passage way leading to the east and out of doors, thence across the street to the east near Mrs. Tincher’s gate, where he was shot the second time, in the upper part of the left breast just beneath the shoulder joint, the bullet taking a course down the left arm some inches; that *343 at some time during the struggle he was in contact with the other one of these men. And at one time during the struggle he was in contact with the other one of these men. And at one time his wife came to him saying: ‘Will, is this you?’ That his wife, fast losing consciousness, more or less immediately worked her way to the back door, out of which she fell where she was afterwards found; that the men who had been in the house were both near the fence near Mrs. Tincher’s house, and after the last shot was fired, ran to the southwest, past the woodhouse belonging to the parsonage, past the stable and west by the road shown running to the west one square south of the parsonage; that in so running to the southwest they either threw or dropped the razor with which appellant had been cut, and his trousers, which they had rifled.” The evidence shows that a six-chamber, 32- caliber revolver was found later on near the coal house inside of the premises of the appellant, and the State’s evidence was such as to justify the jury in believing that the revolver found was the one with which all the shooting had been done, and that the razor found was the instrument with which appellant had been cut and that both razor and revolver belonged to appellant, and were both in his possession in his house before the killing was done.
The evidence also shows that a pocket-book was found 30 or 40 feet west of the razor on the same street two or three feet from his barn, which set out on the line of that street. The theory of the State is that the appellant himself shot his wife, inflicted the wound already described, and, to divert suspicion from himself, invented the entire story of burglars in the house, the struggle and all its incidents; that he shot himself in the two places in which he was shot, and inflicted upon himself the incised wounds with his razor. That the *344 nature of the pistol shot wound-in Mrs. .Hinshaw’s head was such as to produce unconsciousness at once, and to preclude her having walked or talked after it was inflicted. That after shooting her on the bed, he carried her out to the place where she was afterwards found, and that he threw the revolver, razor, pocketbook, and rifled pantaloons to the places respectively where they were found. Appellant’s learned counsel, in attempting to maintain that the evidence was not sufficient to exclude every reasonable hypothesis or supposition.other than that of the guilt of the accused, as must be the case where the evidence, as here is purely circumstantial, “Suggest,” as they claim, “a more reasonable theory, one more consistent under the assumed facts with human nature, that upon that night, after their return home, the wife having heard, from some source, some rumor that he was maintaining illicit relations with some other woman, with her jealousy aroused, charged the same upon him, and a quarrel ensued, and that in a fit of desperation she shot and inflicted upon herself the wounds of which she died. The appalling fact that his wife was fatally shot in his presence stared him in the face. He might naturally, from a desire to save her reputation as well as his own, seek to divert suspicion from the theory of her suicide, or he might in the excitement of the moment fear that he might be suspected himself of shooting her,although she had actually shot herself; and he might feel that it would be difficult to rid himself of such suspicion; or both of these motives might have co-operated. And thus appellant might, upon the theory of the facts assumed, have invented the story he told, and entered upon the execution of the plan.” The inherent unreasonableness of this hypothesis is so great that even human credulity revolts at it. Counsel in suggesting this hypothesis had just turned away *345 from a contention that the appellant was a minister of the gospel in high standing, against whose purity of character nothing could be said. But this hypothesis or supposition asks the inind to assume that there was a rumor in the neighborhood that this same minister of the gospel was maintaining illicit relations with some other woman than his wife, which idea is scouted in another part of appellant’s brief as unreasonable. The idea that a pure minded minister of the gospel, whose wife should commit suicide in his presence, should deem it necessary, in order to protect her good name against the consequences of such an act, to weave a web of falsehood and deception by taking his razor and slashing his breast and arms, making many incisions, and wounding himself twice with his revolver, • throwing his ’ trousers with rifled pockets, his pocket-book, his razor and his revolver into the places where they were found, and going out in his night clothes barefooted onto the frozen, snowy ground, bleeding at all these wounds, and raising the cry of murder and call for help, and telling that burglars did it all in order to deceive the people, is more than human credulity can entertain, and is too unreasonable for belief. ■
It is equally unreasonable to suppose that he did these things to divert suspicion from himself as her murderer, if, in fact, she committed suicide. The very suggestion of such a hypothesis seems to be born of the thought that he was fully capable of unnecessarily attempting such a deception. And that such a supposition is wholly unreasonable, is demonstrated by appellant’s learned counsel, who, immediately after suggesting that hypothesis, say: “Now we turn from this argument, which has been disagreeable to us, because of its necessarily conceding facts, for the sake of the argument which we do not believe exists; and as to *346 many of which we do not believe that there was any such evidence, as that a jury might find that they existed, even in a civil case, to be disposed of upon the preponderance of the testimony.” That some one killed Thurza Hinshaw at the time and place charged, by shooting her through the head is rendered as certain by the evidence as anything well can be. That evidence makes it clear beyond all doubt that no human being had the opportunity to do the deed except herself, the appellant, or the alleged burglars. The supposition or hypothesis that she did it herself is rendered utterly unreasonable and unbelievable by appellant’s own account of the tragedy, as well as the other evidence. Therefore, there is no reasonable hypothesis left as to who did the deed except that it was done by the alleged burglars, or by the appellant. Every other reasonable hypothesis is excluded by the evidence. Let us see whether the-evidence excludes the hypothesis that burglars did the killing. The appellant’s own statement shows that he and his wife went to bed about 11 o’clock that night. There was evidence, from which the jury would have been justified in believing, that the matter that kept them up so late was the attempt to settle a little dispute between them that night. The killing, according to his own statement, occurred about 1 o’clock. When found she had on no night gown, but had on her undergarments and petticoat, and her hair was not let down, but was still done up in a knot and held in place by a stick-pin; there were two or three lady’s night gowns found in the wardrobe that had been worn since being laundried. There was evidence showing that sometimes she did not sleep in a night gown. There was evidence from which the jury were justified in concluding that she was not asleep when she was shot, and that her face was buried in the pillow in such a manner that *347 she would shortly have smothered if she had continued in that position any great length of time. The undisputed evidence shows that the bed was standing in the southwest corner of the room, the head thereof against the west wall and the south side of the bed was against the south wall. If she was killed by a burglar as stated by appellant in his accounts, the evidence was such as to warrant the jury in believing that the revolver that killed her was pressed into the pillow, and to do so the burglar must have reached over the face of her sleeping husband and pressed his arm near to or against his face in order to get the revolver, into the position that the powder on the pillow slip unmistakably indicates. From this evidence the jury were justified in concluding, as a matter of fact, that it was too unreasonable to believe that a burglar would have spared the powerful man in the front of the bed, who, when aroused, would or might make a much more dangerous fight on the burglars, and kill the wife lying-on the back of the bed. It was the exclusive province of the jury to settle that question of fact, and if they erred therein we cannot correct it. Deal v. State, 140 Ind. 354, and authorities there cited. The evidence was also such as to warrant the jury in concluding, from the powder burn on the pillow, that it was not an accidental, but a deliberate and intentional killing. The evidence was also such as to warrant the jury in believing, from her clothing and other matters in evidence, that she had not retired for the night, as she must have done if she was killed by burglars; and everything was as it might reasonably have been expected to be if she was in fact killed by her husband.
According to appellant’s account, there were two burglars, one a. tall, slim man, armed with appellant’s revolver, with which the shooting was all done, and a low, heavy set man, with his cap pulled down over his *348 face, armed with appellant’s razor, with which he cut appellant seventeen times in the course of the struggle, which was long and peculiar. And as that long and peculiar struggle approached the opposite side of the street from the house, the tall; slim man, who had been but an idle looker-on during a large part of the struggle, concluded .to terminate it, and to that end ran up and thrust the muzzle of appellant’s revolver against appellant’s ribs and fired the second shot into appellant’s person, when appellant released his hold on the heavy set man, sank to the ground unconscious, and as he revived in a little while, according to his own story, he saw stars and mansions dancing before his glimmering vision, while the alleged burglars must have ran back into the house, rifled his pantaloons pockets, .scattered his loose change, knife and keys on the floor, carried Mrs. Hinshaw from where she was shot on the bed, from whence the jury were fully warranted by that part of the evidence tending to support the verdict, in finding that she never arose therefrom, and threw her out at the steps of the back door with such violence as to break the skin on the back of her head as it struck the board, carefully closed the door between the sitting room and bed room, and the door between the sitting room and dining room, threw appellant’s revolver inside near the coal house, as they started out of the gate to flee to the south, his razor into the street, his rifled pantaloons on the block near the woodhouse, his rifled pocket-book in the street south of the woodhouse, and near the stable, and silently stole away without track, mark or trace of their going on the fresh fallen snow. There are many, very many, strange and unnatural things that we are called on to believe, if any faith or credit shall be given to the appellant’s story. And here it must be borne in mind that we do not mean by this discussion to depart from *349 the rule that we are not authorized to correct errors of fact occurring in the trial court. But appellant’s contention being that the evidence being all circumstantial as to ivho committed the homicide, and as the law requires in such cases that the evidence must be sufficient to exclude every other reasonable hypothesis or supposition than that of appellant’s guilt, and that the evidence in this case is not of that character, it becomes necessary to discuss it to determine the question, without any attempt to interfere with the exclusive province of the jury to determine conflicts in the evidence, or to settle mere questions of the weight of the evidence. In the first place, the alleg’d burglars are the most unnatural burglars that the annals of crime gives any account of. But why they should go there without the usual weapons of burglars, the knife and revolver, is real strange. Stranger still, and more unnatural, is the fact, if it be a fact, that they went there at all, that they must have first gone to work to hunt for, and did actually find, appellant’s revolver and razor with which to defend themselves against the assaults of the sleeping woman. And equally strange and unnatural did the alleged burglars act in not rifling appellant’s pockets before hunting for and dragging from their hiding place in the press or cupboard, appellant’s revolver and razor. The only natural and perceivable interest burglars could have had there was to get what little money appellant had, there being no other valuables there suitable .for burglars to carry away. And appellant’s own statements made it absolutely clear that the burglars could have rifled appellant’s pockets, gotten what money he had and went away without waking either the appellant or his wife. How strangely unnatural burglars they were, choosing to kill rather than get away with appellant’s valuables. Then, again, they manifested another strange *350 freak in taking deadly aim at and killing the woman, in whom there was necessarily much less danger to them than there was in the husband, if, in fact, they, were real, genuine burglars. It might be otherwise if they were only imaginary burglars. But this is not all of the strange and unnatural doings of the alleged burglars. And the unreasonable and unnatural doings involved in appellant’s story are not all confined to the acts of the mysterious burglars. Many of the acts of the appellant are equally strange and unnatural. How this fierce and terrific struggle for life between two men could go on around, and around, through the rooms of that house, in every one of which there was furniture, such as chairs, one of which had a coal oil lamp sitting on it, rocking chair, table, sewing machine', bookcase, wardrobe, stoves, and beds, and yet not a single article of furniture was disturbed or a single mark of such a great struggle left, is difficult to conceive. Nor is there any explanation offered by ap-' pellant how it could be so. ■ It was quite unreasonable and unnatural in the burglars to suffer this struggle to go on so long, every moment of which was endangering them and making it more and more likely that some one would see it and come to appellant’s rescue and capture them. The sequel shows that they could have ended the struggle at any time they chose. But above all, the unreasonable and unnatural acts involved in appellant’s story is that he and his wife should engage in a struggle for life with two ferocious burglars, and that his wife should come up, lay her hand on his arm and coolly say to him, “Will, is this you?” and wholly forget the instincts of nature to scream “murder!” instead of quietly and indifferently witnessing such an aAvful struggle between her husband and a burglar. One such scream would, as the evidence shows, have brought the village people out to their assistance. *351 But still more unnatural is the conduct of the appellant engaged in that awful struggle throughout all the rooms in the house, out into the back yard and out into and across the street, the burglar cutting and carving away at him with appellant’s razor, until he had made seventeen gashes, and yet the appellant either forgot the instincts of his own nature in forgetting to make an outcry for help, or he was too considerate for the safety and convenience of the burglars in making their escape. Both burglars seem to have been equally considerate of the appellant’s life and safety, because the nineteen wounds they inflicted on him were all so inflicted as to make a simple superficial flesh wound not involving the slightest danger to appellant. The first ball with which appellant was shot simply passed through the fleshy part of his breast, and fell down on the bed. The last one was so aimed as to make it impossible for it to strike a vital part or make a dangerous wound. All of the cuts with the razor were in such places on his breast and arms as to make it safe for him to inflict them. Those about the throat or neck were like pin scratches and utterly harmless. The supposition that these two burglars could not inflict one single mortal or serious wound on this lone man if they had wanted to, while they were able, at the very first shot, to send a bullet crashing through Mrs. Hinshaw’s -brain is a most exceedingly unreasonable and fallacious story. That part of the evidence which tends to support the verdict was such as to authorize and justify the juryin finding that thewounds inflicted on appellant were all self-inflicted. It is true the proof on this point was not free from conflict. But it is the province of the jury to determine such disputes and controversies, and if they err therein it is a mistake of fact and not of law. The only remedy for the correc *352 tion of such a mistake is an application to the trial judge for a new trial. If he overrules such motion, the presumption is that he did his duty and that the jury had not made any mistake of fact. Cincinnati, etc., R. R. Co. v. Madden, 134 Ind. 462; Deal v. State, supra. The evidence shows that one shot was fired through the front door of the bed room, slanting downwards at an angle of about 45 degrees, and which proved beyond doubt that that shot was fired at no one; that made three shots fired inside of the house. Then the undisputed evidence of the neighbors shows that there were two shots fired outside of the house. When appellant’s. revolver was found, five chambers were found empty and one loaded. The above is only a mere outline of the substance of the evidence, which fills nearly 2,000 printed pages of the record. Appellant’s contention is that such evidence is not sufficient to exclude, beyond a reasonable doubt, every other reasonable hypothesis than that of the appellant’s guilt. We think, after a most careful and painstaking examination of the whole evidence, that that part of it which tends to support the verdict fully justified the jury in the belief and in finding that there were no burglars there that night at all, and hence that Mrs. Hinshaw was not killed by a burglar. Indeed, we could not say, after such consideration of the whole evidence, if it were even our province to weigh it and settle conflicts therein, that the jury made a mistake of fact in concluding that there were no burglars there that night. It therefore results in a moral certainty that no one had the opportunity to shoot Mrs. Hinshaw to death but the appellant, her husband. On the subject of the legal force of exclusive opportunity to commit a crime as a circumstance tending to prove his guilt, an eminent author on circumstantial evidence says: “Where the relation between the parties, instead of *353 being temporary, like those just noticed, is permanent, as between master and servant, or between persons constantly inhabiting the same house, opportunities for crime become multiplied; and judicial records show how constantly they are embraced. Thefts and robberies by domestics are of notoriously frequent occurrence. Peculiar opportunities and facilities, even for the commission of higher crimes, are found to exist where the servant occupies a place of especial confidence, being admitted to his master's presence at all hours, and constantly entrusted with the care of his valuables, and almost with the charge of his person. It was this confidential relation that gave opportunity to Courvoisier to commit his atrocious murder of Lord William Russell, in 1840. Where the relation between the parties is of a still more intimate character, as between members of the same family, and particularly between husband and wife, opportunities for the commission of crimes of the highest grade become indefinitely multiplied. They are, in fact, of hourly occurrence. There exist in the relation last mentioned, all the elements to constitute the most perfect opportunity that can be desired — unlimited access to the person, and complete seclusion during hours when that person is in its most defenseless state.” Bur-rill on Circumstantial Evidence, pages 357, 358. The same author, in that connection, further says, on pages 369, 370: “In the crime of murder, which occurs first for consideration, * * * the strongest form of presumption against a person accused * * * arises from the circumstances which, while they show his presence at the scene of the crime at the time of its commission, exclude, at the same time, the supposition of presence of any other person; leading, in fact, rather to a necessary conclusion than to a presumption in the proper sense. * * * The closer these are brought *354 to the subject of the crime the stronger their effect to demonstrate the presence of the accused, and to show such presence to have been exclusive. Proximity, on the part of the accused, as thus presented for consideration, may be, in itself, of various degrees, from mere vicinity, up to actual juxtaposition or contact. It may also be of various kinds, such as proximity to the person of the deceased, or to the scene of the crime, or to both; and it may exist at different stages; as before the commission of the crime or afterwards. * * * The strongest form in which this circumstance can be presented, and the one which requires the least reasoning to give it effect, is undoubtedly that of juxtaposition of the persons of the accused and deceased, proved, by actual observation, to have existed both immediately before and immediately after the crime is perpetrated. These show presence at the moment of actual perpetration, with the greatest effect possible, short of direct evidence; and they be so connected by the circumstances of time and place, as to have the full exclusive operation just mentioned. For example, two persons are seen alive together in a room having but one means of entrance or exit; and an alarming sound or outcry is heard, and the room is immediately entered; and one of the persons is.found dead or dying from a mortal wound or stroke, and the other standing near him; and no other person is seen. Here the immediate entry, in connection with the physical character of the place, would demonstrate the impossibility of the presence of any third person; and, assuming a corpus delicti, or that it is, in fact, a case of murder, the perpetrator would be as clearly indicated by the mere force of the circumstances, as if he had been seen to inflict the wound; the case being one of circumstantial evidence of the certain kind.”
As before observed, the circumstances in evidence, *355 an outline of which is detailed above, justified the jury in concluding to a moral certainty, that appellant and his wife were alone together in their house on the night of the tragedy, if notin bed together, and that no other person was there, and while they were thus alone she was shot through the brain with a pistol ball, from which she died. Under the principles of the law of circumstantial evidence laid down above, as" well as the rules of common sense, it as inevitably follows that appellant shot his wife, almost as if he had been seen in the act by a dozen witnesses. But it is insisted, with great apparent earnestness and signal ability by appellant’s learned counsel, that the circumstances in evidence are not sufficient to prove beyond a reasonable doubt that there were no burglars there that night, and that appellant and his wife were alone together. The great number of circumstances in evidence pointing to the absence of every other human being than appellant and his wife that night when the crime was committed, has an important bearing on the point now under consideration. The same author from whom we have just quoted, says: “In treating, more particularly, of the process of presumption from facts proved, in criminal cases, what is called the probative force or proving power of such facts,— that is, their competency to establish the probability, and, by that means, the truth of the principal fact or affirmative hypothesis, — • becomes a very important subject of consideration. The probative force of a body of circumstantial evidence is said to depend upon the following considerations, namely: (1) the number, (2) the independence, (3) the weight and (4) the consistency of the elementary or component circumstances themselves. * * * But the operation of number — of the mere addition of one fact to another, — is more strikingly seen in the *356 power of heightening probability. A single fact, — say, the first fact proved in the case, — may produce no more than a slight impression of the probability of the hypothesis proposed; the next fact proved, though, in itself, of the same slight kind, will, taken (as it must be) in connection with the preceding, often raise this impression to a determinate and very considerable degree of force. In this way, a number of circumstances, each individually of slight significance, may so tally, and confirm each other, as to leave no room for doubt of the fact they tend to establish. The importance of number becomes still more apparent when it is considered that the effect of increase in this respect, (provided the circumstances themselves have the quality of independence, which will next be considered,) is not only to increase, but actually to multiply the probability of the conclusion sought. Or, to speak in mathematical language, the probability of the justness of the conclusion, is not merely the sum of the simple probabilities created or afforded by the individual circumstances, but is the multiplied or compound ratio of them. Thus, (to borrow an illustration from the writer above quoted), on an indictment for uttering a bank note, knowing it to be counterfeit, proof that the accused uttered a counterfeit note, amounts to nothing, or next to nothing, — any person might have a counterfeit note in his possession; but suppose further proof adduced, that shortly before the transaction, he had, in another place, and to another person, offered another counterfeit note, the presumption of guilty knowledge becomes very strong. And it might be added that if still further proof were made of a similar kind, as of the offer of a third or fourth note, the presumption would soon become conclusive. * * * What is meant by a conclusive, and what by an inconclusive circumstance, may, perhaps, be more ade *357 quately explained by an example than a definition. The following, taken from the writer last named, furnishes a very simple illustration: The circumstance of finding an article which has been recently stolen, íd the possession of a person charged with the theft, though of a highly suspicious nature, is, in itself,, imperfect and inconclusive; find, therefore, quite insufficient as a basis of conviction. But if, in addition to this, it be proved that the party accused wholly refused to account for the possession, or attempted to impose a false account,' the latter circumstance is said to be conclusive. It will be seen from this, that conclusiveness, as applied to circumstantial evidence of the presumptive kind, is not a quality absolutely belonging to a fact, in itself considered, but is the result of union with something else. The two circumstances in the example must be considered together; the latter is based upon the former, and, indeed, necessarily implies its existence. The former, without the latter, would be incomplete; with the addition of the latter, it becomes complete, and, consequently, conclusive. * * * To return .to the more general term 'weight/ employed in introducing the present subdivision of the subject. The value of the weight, as a quality of circumstances, may be most aptly appreciated, by considering it in connection with that of number, which has been already treated of. Each of these qualities, when present, adds immensely to the force of the other, but each of them has also the effect of compensating, to a certain extent, for the absence of the other. The' more weighty the circumstances individually are, the smaller the number necessary to authorize a conclusion. * * * On the other hand, mere number constantly has the effect of giving a determinate resulting weight to facts individually of slight significance. * * - * The consistency of the facts constituting a body of evidence, with each other, *358 and with the hypothesis or principal fact sought to be deduced from them, is another important consideration in determining their aggregate proving power. The consistency of these facts with the hypothesis of guilt is, indeed, under all the circumstances, essential.” Burrill Cir. Ev., pp. 156, 157, 161, 163. When we consider the circumstances that the alleged burglars came to the scene of the crime unarmed, or at least relied on simple good luck or chance in finding weapons suitable and necessary for a burglar’s use in the commission of his contemplated burglary, in the house where his crime is to be committed, the extreme improbability of the presence of any such burglar is very striking. That such burglars should first find a weapon instead of getting what little money appellant had and other easily concealed valuables and get out, seems equally striking in its improbability; that they should have shot the powerless and sleeping woman at all staggers human credence, and especially so that they left unharmed her powerful husband, and. to burglars unacquainted with his harmless way of fighting for his own life, one far more necessary to their safety to kill, seems extremely improbable; that they, the burglars, and appellant and his wife should have engaged in a life and death struggle around and through the four rooms of that house without disturbing any of the furniture is equally incredible, if not impossible; that either appellant or his wife should have engaged in such a horrible and horrifying struggle in the dead .hour of the night without making a sound, without a single outcry, until after the deceased was wholly unconscious and the burglars were safely out of sight, is so glaring in its absurdity, improbability, and unreasonableness that the impartial mind recoils when it is seriously offered as a truth; that the two burglars permitted a struggle fraught' *359 with great danger of their capture to continue so long when the sequel shows they could have ended it quickly and easily is equally marvelous and unbelievable. That they made so many efforts to kill the appellant and never inflicted a single mortal or serious wound, while they had the skill and ability to plunge a bullet through Mrs. Hinshaw’s brain on the first effort, a thing wholly unnecessary to their safety or their purpose, unless their sole purpose was to fix her so she would tell no tales, instead of plunder and robbery, seems also rankly improbable1 and unreasonable. The circumstance that appellant, while unconscious, was able to see which way the burglars fled defies common sense, The fact that the burglars made their escape without leaving a track, mark or trace on the fresh fallen snow speaks in language of great force, and that no one heard or saw them going,' as the evidence overwhelmingly shows, is also of marked significance. The circumstances are consistent with each other, and perfectly consistent with the hypothesis that there were no burglars there, and that no human being but appellant and his wife were present when she was shot. Indeed, the only way in which these numerous and peculiar circumstances can be accounted for is the hypothesis that no one was present when the homicide wa.s committed but appellant and his wife. They are consistent-with that supposition, and absolutely inconsistent and irreconciliable with any other supposition. And these circumstances, in their proving power have the legal quality required of not being dependent on each other; they are independent of each other. There was no circumstance brought to light by the evidence that'it is even claimed by appellant’s learned counsel was inconsistent with the hypothesis thatno human being was present, when the homicide was committed, but the appellant and his *360 wife. It follows from this that all of appellant’s account as to who committed the homicide, with the incidents as to the burglars, was pure fabrication. There could be no motive for fabricating evidénce other than appellant’s own guilt of the homicide. This circumstance again strengthens the other circumstances pointing to his guilt. The author already quoted says upon this point: “Facts, or outward appearances, which have been fabricated by the criminal himself for his own protection, are always inconsistent with the realities of the case, and are always intended to be so; but owing to the artifice employed in fabricating them, the moral facts which accompanied and produced them, and- which if observed would have entirely removed the inconsistency, have been hidden from human view. But even in those cases, the inconsistency thus artifically produced, often serves a useful purpose in leading to a minute and rigid scrutiny of the circumstances, and consequent detection of the fraud.” Burrill Cir. Ev., p. 164.
The same author, at page 435, says: “The fabrication or corruption of evidence has been very justly considered as creating, against the party who has had recourse to such a practice, a presumption even stronger than the destruction or suppression of it.” See, also, Doty v. State, 7 Blackf. 427; Thompson v. Thompson, 9 Ind. 323; Doan v. State, 26 Ind. 495; Starnes v. Allen (Ind. Sup.), 45 N. E. 330.
These circumstances, taken in connection with all the others, increase the strength of the others immensely, and they in turn increase the strength of these. All these circumstances, and all others brought to light by the evidence surrounding the homicide, in the language of the author from which we have quoted, “so tally and confirm each other, as to leave no doubt of the fact they tend to establish,” namely, *361 that no person was present when the homicide was committed except appellant and his wife. This process of tallying and confirming each circumstance by the others does not infringe the general rule that one inference cannot be based on another. There is an important exception to that rule, however. A fact in the nature of an inference may itself be taken as the basis of a new inference, whether intermediate or final, provided the first inference has the required basis of a proved fact. Burrill Oir. Ev., p. 138; Best on Pres., section 187; 1 Greenf. Ev., section 34. In short, it is not merely the sum of the simple probabilities created by the numerous individual circumstances pointing to and indicating the absence of burglars and all other human beings than appellant and his wife at the scene of the murder, but is the compound ratio of them all tallying with and confirming each other that made them all strong enough when considered together as to fully justify the jury in believing and finding that no burglars and no other human beings than appellant and his wife were present when she was shot; from which they had a right to conclude to a moral certainty that appellant committed the murder. But appellant’s learned counsel insist that one circumstance appearing in evidence is so inconsistent with all the other circumstances to which we have alluded that it leaves the matter of appellant’s guilt at least in doubt, and that is, as they claim, the total absence of any adequate evidence for a reasonable motive in the appellant, under the circumstances surrounding him, to do the atrocious act of murdering his wife. On this point the author we have quoted says, on p. 290: “It remains to consider in the next place, that class of motives which have for their end the gratification of unlawful passion. These constitute a most fruitful source of crime *362 especially of the atrocious offenses of murder, mayhem, rape and arson. * * * An adulterous wife, at the instigation, or with the aid of her paramour, is induced to destroy her husband. A husband who has formed a connection with another woman, or who has been compelled to marry, or to support the wife he has abandoned, is tempted to rid himself of what he feels to be an incumbrance.” And on p. 296 the author says that: “Motives are made use of like other evidentiary circumstances, not for their own sake, or from any view of speculative curiosity, but simply as means of arriving at the knowledge of an ultimate fact. They are resorted to, as elements of evidence, not from any supposed necessity of accounting for, or explaining the reason of a criminal act which has been clearly proved and fixed upon the accused, however strange or inexplicable such act may in itself appear; but from the important aid they always render in completing the proof of the commission of such act by the party charged, in cases where it might otherwise be thought to remain in doubt. With motives, in any speculative or psychological sense, neither the law, nor the tribunal which administers the law, has any proper concern. The outward acts of men are all that they profess, or are called upon to regulate or to punish. * * * And that motives may be inferred from conduct, as well as conduct from motives, is a familiar principle in the law of presumptive evidence.”
So that the jury were legally justified in inferring a motive from the commission of the crime itself; if motive had been essential to make out the crime, but it was not. But there was evidence from which the jury were fully justified in inferring that appellant was actuated by a very natural motive, though extremely atrocious it was.
*363 The evidence was such as to justify the jury in the belief that appellant had been seen going into a certain house in Belleville clandestinely, the back way, where a certain young woman lived. On a certain other occasion when appellant’s wife was compelled to drive to Danville, some ten miles away, to take her sister to the train, appellant sent for this same young woman to come to his house, which she did and spent a large part of the afternoon with him practically alone. On another occasion this same young woman was seen between midnight and four o’clock in the morning coming from the alley immediately in the rear of appellant’s residence and from that alley west the width of the adjoining lot to appellant’s residence into another alley running south into the street fronting appellant’s residence and thence diagonally southwestward to the west side of that street in the direction of the house where she lived, and was seen to enter it and close the door after her. And the evidence tended to show that his wife was away from home at the time and that he was at home alone, though there was some conflict in the evidence as to this matter. After the tragedy this young woman, unlike the rest of the neighbors, did not go to the appellant’s house until several days, and when she did go, she was observed standing close to the bed whereon the appellant was lying engaged in conversation with him in such low tones of voice that the witness in the same room, could not hear what she said. An effort to meet this evidence on the part of the appellant, was made which itself is a circumstance that he and counsel deemed it of sufficient importance to require some response. And the only response was evidence strongly tending to show that he himself was away from home, and in Randolph county, as well as his wife, on the night that the young woman was seen coming from the direction *364 of his house, and going into the house where she lived, after midnight. The trial occurred about a year after that occurrence, and the jury might have considered that the witnesses on both sides of that issue were perfectly honest, but that one side or the other had failed to remember the date of the transaction correctly to which they testified. Indeed it was the bounden duty of the jury to harmonize this seemingly conflicting evidence if they could, and thereby avoid imputing perjury to the witnesses on either side. Wright v. Wright, 5 Ind. 389.
But it was in the power of the appellant to produce a witness that knew better than any other human on earth whether that young woman came out of appellant’s house that night or not, and if she did, whether appellant was there or not, and whether his wife was absent or not; and that was the young woman herself. Nay, more, she better than any other disinterested human being knew if it was a fact, that nothing improper had ever taken place between her and the appellant. And no mere qualms about modesty or supposed embarrassment to the young woman, when a neighbor and a fellow-being was on trial for his life and liberty should have kept her off the witness stand, if the relation between them had been free from impropriety. When a defendant thus circumstanced fails to bring to his assistance such evidence, it creates a presumption against him. The author from which we have quoted, on p. 166, says: “It rests on the broad presumption that a man will do that which tends to his obvious’advantage, if he possess the means. On this ground, it is remarked by a learned writer, that £if, on the supposition that a charge or claim is unfounded, the party against whom it is made, has evidence within his reach, by which he may repel that which is offered to his prejudice, his omission to do so *365 supplies a strong presumption that the charge or claim is well founded; it would be contrary to every principle of reason, and to all experience of human conduct, to form any other conclusion.’ ” 1 Starkie on Evidence, 487.
It is true that appellant himself knew as well as the young woman whether any improper relations had ever existed between them or not, but it was his lawful right to decline to testify in the case and leave the State to grope in the dark in its search after the circumstances, and such failure to testify by appellant cannot be commented on or referred to in the argument of the cause, nor referred to in any manner or considered by the jury. Section 1867, Burns’ R. S. 1894 (1798, R. S. 1881).
But not so as to any other competent witness who, the circumstances disclose, must know personally and fully all the facts upon the matter under investigation; especially where that witness is the only disinterested one in the nature of things who can know such facts, and whose testimony is within the reach of the accused, as was the case here. So that the jury were fully warranted in believing and finding that the appellant had formed some sort of relation or association with the young woman mentioned, which was highly improper for a married man and especially a minister of the gospel, and that such relation was the motive for the killing of his wife, all of which he hoped to conceal. While not regarding the establishment of motive to do the deed as indispensable to the conviction of the appellant, and while it is possible that criminal relations may not have existed between the appellant and the woman mentioned, the suspicious circumstances pointing towards such relations made a basis for the difficulty between the appellant and his wife on the night of the homicide, as admitted by him, and *366 that difficulty of itself, and in the absence of the criminal relation mentioned, strongly suggested motive and made a question for the jury to pass upon. The motive thus established constitutes another circumstance which adds immensely to the probative force, and the weight of each and all of the other circumstances outlined above, making the train of circumstantial evidence strong enough to impart to it the legal quality, which appellant’s counsel say was lacking, and justify the jury in so finding beyond a reasonable doubt, namely, that it was “such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense imputed to him.” Burrill Cir. Ev., p. 737.
Because, as said by Burrill, “Circumstances cannot lie. Pacts cannot lie and never lie. They are not moral agents, who alone are capable of such action, nor are they subjects of those moral influences which divert human beings from the path of truth. They are inanimate existences and thus in their nature inflexible; in the common phrase ‘stubborn things.’ Hence they have sometimes been significantly called ‘mute’ or ‘dumb witnesses.’ ”
Therefore we conclude that the evidence was legally sufficient to well support the verdict. The next point made for a reversal is the thirteenth specification of error in the motion for a new trial. It was the action of the court in overruling appellant’s objection to the evidence of Dr. Geis as an expert microscopist. He stated that he had examined what appeared to be a blood stain on a block of wood handed him by one of the State’s attorneys, requesting such examination. The block had been taken from the window of the woodhouse, standing out flush with the street. It appeared that the blood stain had not been discovered there until August 13, 1895. He testified that the stain on the block was blood from an animal of the *367 mammalian family, and that it was consistent with human blood. The only object the State had in introducing it was-to tally with the State’s theory that appellant after killing his wife and inflicting the wounds on himself went into the woodhouse and from this window or opening onto the street threw out his pantaloons with rifled pockets, threw the razor, pocketbook, and revolver to the places where they were, respectively found, and in so doing blood dropped from his wounds onto the sill, etc. The objection was to its competency, because as it was claimed it was tantamount to instructing the jury that they might first infer from the fact that it was mammalian blood that it was human blood, and from that inference infer that it was appellant’s blood, and from that inference that it fell from his wounds that night. Counsel cite many authorities to the general rule that an inference cannot be based on a mere inference. But counsel are entirely wrong in assuming that by the admission of .that evidence the court either impliedly or otherwise so instructed the jury. The blood stain was a mere circumstance in and of itself of little or no importance; especially was it of no importance unless there was evidence, circumstantial or otherwise, authorizing the inference that it was dropped there that night. Evidence that it was there before, or was placed there after that night would render it of no value whatever. But the blood stain was there, and it was consistent with and might have been human blood. The first step was to prove that fact. However small its force alone,it might become important by the addition of the proof of other circumstances.. The court had no right to assume in advance that those other circumstances giving it a pertinent and vital force would not be proven. One circumstance in it *368 self may be no more intelligible than a piece torn from a letter torn into small pieces and scattered, with bnt a few of the words on each piece or a piece torn from a book in like manner. When the pieces one by one are brought together and fitted into the places where they belong, each becomes more and more intelligible as they are replaced into the torn-up letter, and not only does each piece become more intelligible as it is added to the whole, but it likewise has the same effect on' the other pieces or parts. And yet, if a court should entertain an objection to each piece as it was offered to be placed in the letter because it, of itself, or connected with the parts already in the hands of the court would remain unintelligible, unless some other parts could be adduced; such objection would be no more unreasonable and no more untenable than the one we are considering. The rule governing in such a case is so aptly expressed by Burrill that we appropriate his language. “Hence the very first step he [the investigator] is obliged to take, is actually to revive and recall hi® subject; to ‘retrieve’ it (in the words of Lord Chief Baron Gilbert) from the ‘obscurity’ into which it has fallen; to search for and collect the scattered facts which compose it, and to put them together, as nearly as possible, in their original connection. This must always be done, before the great business of trial, — examination and decision — can be intelligently entered upon. It is this peculiar process of revival and reconstruction, that the characteristic difficulties of judicial inquiry by means of circumstantial evidence, are found to consist.” Burrill Gir. Ev., p. 95.
If there was no circumstance in evidence that connected the blood stain with the fatal tragedy that night, then we are bound to presume that the jury had intelligence enough, under proper instructions from *369 the court, to assign no weight or significance to it, and hence there was no error in its admission. People v. Gonzalez, 35 N. Y. 49; Lindsay v. People, 63 N. Y. 143.
But there were circumstances making it more than probable that the State’s theory was correct, that after wounding himself he threw the articles already mentioned out of the woodhouse window or opening where the blood stain was found; because there were no tracks on the fresh fallen snow of any person in the street where these articles were dropped or anywhere near them in the street or elsewhere. And furthermore, though appellant’s story was that the seventeen cuts with the razor were inflicted during the long struggle through the four rooms of the house, out through the back yard and into and across the street, yet not a blood stain was found on any part of the floor or ground covered by the struggle. This circumstance heightened the probability that he went into the woodhouse to do the cutting on himself, where any drops of blood that might fall from his wounds might be easily lost sight of in the litter in the woodhouse. Complaint is made of the admission of answers to certain questions on re-examination of Miss Eva Worrell, one of the State’s witnesses. She was among the Very first to look out at her bedroom window and saw the appellant near Tincher’s fence, where he commenced to make outcries. She had testified in chief that she had looked and listened and neither saw nor heard anybody running away. On her cross-examination on behalf of appellant she had testified that upon the night of the tragedy she at first was under the impression that she saw the feet of men just as she looked out disappearing behind the barn or woodshed just to the south of where appellant claimed that he was shot the last time and from whence he claimed *370 the men ran away. And that shortly afterwards she had stated that such had been her impression. But later she had become convinced that she had been mistaken as to the appearance of feet. On re-examination by the State after stating, that her impression as to seeing the men was vague, the State’s counsel asked her to “State if a short time after the tragedy * * * Mr. Marker came to you and asked you about that circumstance of the feet disappearing around the barn? First state whether he came to you.” Answer, “He did.” “Q. What did you say to him?” She answered over appellant’s objection as follows: “Mr. Marker said that Mr. Hinshaw told him to tell me to come over there and tell him about those two feet I saw, and I told Mr. Marker to tell Mr. Hinshaw that I did not see any two feet, and if I had seen anything that would help him in his search for the robbers, I would gladly have told it.” The matter of this exception is of such slight importance that it probably would not be cause for reversal if even the overruling of the objection to the question and answer had been technically erroneous. But it was not even technically erroneous. The defense on cross-exgmination had drawn from, the witness evidence that she had made statements out of court inconsistent with her evidence in court. That is one of the methods of impeachment of a witness. Shields v. Cunningham, 1 Blackf. 86; McIntire v. Young, 6 Blackf. 496; Seller v. Jenkins, 97 Ind. 430; Curme, Dunn & Co. v. Rauh, 100 Ind. 247. And so, too, the witness thus sought to be impeached may be supported by proof of declarations made in harmony with his testimony in court. Dailey v. State, 28 Ind. 285; Perkins v. State, 4 Ind. 222; Brookbank v. State, 55 Ind. 169. That is all the answer amounted to.
The next exception is to the admission of the evidence of William J. Cope, who lived in the village, to *371 the effect that he had called George Miller’s attention to the fact that he had seen the appellant go into the yard after dark where the young woman in question lived. Miller was also a resident of the village. This evidence alone was of no significance or importance whatever, but in connection with all the other circumstances might be of some importance and relevancy. There was no error in admitting it. It is next complained that the court erred in striking out a certain question and answer of the witness, William J. Schwindler, concerning the finding of the revolver. The second Sunday after the tragedy the revolver was found just at the foot of a post, near the corner of the coal bin in the back, yard of appellant’s residence. The witness had testified that on the morning of that day he had stood right at the post, leaned upon it and moved about and had not seen the revolver. He was asked if there was a pistol there to which he had answered, “I think not; I believe if there was one there I would have seen it.” On motion of the State this entire answer was stricken out. Like the exception before the last, this one was not of vital importance. But the answers were mere conclusions of the witness. The duty of drawing such inference belongs to the exclusive province of the jury. There was no error in this ruling.
Another question of a similar nature, to the same witness about the same matter, calling for a similar answer was excluded in which there was no error. It is next complained that the court erroneously refused to allow the witness, Alfred Carter, to state in answer to a question by the defense, why the pocketbook was not picked up when it was found. The triviality of this exception would be a sufficient answer to it. But there was no statement made by counsel as to what they expected to prove in response to it. In such a *372 case the question can only be saved by propounding to the witness some pertinent question, and upon objection made, stating to the court, as it may direct, the testimony or facts which the witness would detail in answer thereto. Otherwise there is no question presented as to the correctness of the ruling. There was no available error in the ruling. Judy v. Citizen, 101 Ind. 18.
The witness, William McCormack, who testified as to the conversation of appellant concerning the tragedy incidentally stated that he told appellant he had heard about forty different stories about it and no two of them alike, and came to him to get the trne account, etc. On cross-examination appellant’s counsel asked the witness: “Will you tell us some of these stories?'’ to which the State objected and the court sustained the objection. This question, objection, ruling, and exception are in the- same category with the last one above and hence there was no error in the ruling.
Dr. Strong on cross-examination was asked, over appellant’s objection, whether he had not that night, while dressing appellant’s wounds, said to certain of-the persons present: “Some of you level-headed men go ont and look for tracks,” to which he answered. Though this question might be wholly irrelevant and not germane to the examination in chief, yet it is impossible to see how it could work any harm to appellant. Tracks were looked for that night with a view of discovering which way the alleged burglars went. It might have been proper - as tending to establish when Dr. Strong arrived on the scene. It might have been pertinent as indicating that all the persons present were agreed that there was snow enough on the ground to enable those present to track the burglars. On the trial that fact was questioned by some of the *373 witnesses on behalf of the defense. There was no material error in the ruling.
It is complained that the court erroneously overruled appellant’s objection to the oral testimony of George H. Duncan, a member of the grand jury, detailing the testimony of appellant before the grand jury. The objection is; first, that the oath prescribed for grand jurors necessarily implies that they are forbidden to give such testimony, and, second, that the statute requires such testimony to be reduced to writing, and that it was actually reduced to writing, and that such writing being the best evidence, oral testimony as to what appellant stated under oath to the grand jury is inadmissible unless the absence of the written statement is accounted for. • As to the first objection the form of the oath to the grand jury among other things is: “And that you will not disclose any evidence given or proceeding' had before the grand jury.” Section 1721, Burns’ R, S. 1894 (1652, R. S. 1881). But it has been settled law in this State for a long time under the provision quoted and other similar provisions that the oath of grand jurors to keep their proceedings secret does not prevent the public or an individual from proving by one of them in a court of justice, what passed before the grand jury. Burnham v. Hatfield, 5 Blackf. 21; Shattuck v. State, 11 Ind. 473; Burdick v. Hunt, 43 Ind. 381; State v. VanBuskirk, 59 Ind. 384.
But appellant’s counsel rely on the following statutory provision: “A member of the grand jury may, however, be required by any court to disclose the testimony of a witness examined before the grand jury, for the purpose of ascertaining whether it is consistent with that given by the witness before the court; or to disclose the testimony given before them by any person upon a charge against him for perjury, in giving *374 his testimony or upon his trial therefor.” Section 1731, Burns’ R. S. 1894 (1662, R. S. 1881).
It is earnestly insisted that the section just quoted was intended to narrow the scope of the authority of courts of justice to require grand jurors to disclose the testimony of witnesses before the grand jury, when the due administration of justice requires it, to much more circumscribed limits than had existed before. They contend that under it there are only two cases in which a court of justice can require such disclosures; one, where the disclosure is sought for the purpose of ascertaining whether the testimony of the witness before the grand jury is consistent with that given by the witness before the court and, the other, to disclose the testimony given before the grand jury by any person upon a charge against him for perjury in giving his testimony, or upon his trial therefor. It cannot be reasonable to suppose that the legislature intended by this provision to cut off the right or power of courts in the due administration of justice to require grand jurors as witnesses to disclose testimony given before them in any other cases than those named and thus make a radical change in the law as it had existed in the State for a period of over forty years. It rather appears that it was the legislative intent to enlarge the power to require such disclosure so as to extend it to the two cases specified under the supposition that the law did not already extend to such cases. At the time the cases cited as authority in Burdick v. Hunt, supra, were decided, there was no provision requiring an oath of secrecy to be taken by the grand jurors. And it was said by this court in the last named case: “But it is urged that, whatever may have been the rule before, since the legislature prescribed the form of oath which shall be adminstered to grand jurors, they cannot so testify. The part of the oath in *375 question is this: ‘That you will not disclose any evidence given, or proceeding had before the grand jury.’ 2 G. & H. 387 form 56. The case in 11 Ind. was decided long after the enactment of this form by the legislature. But aside from this, we think it cannot be supposed that the legislature intended to chánge the rule which had before existed. As thus understood the grand jurors are required to keep secret the evidence given and proceedings had before them, unless legally called upon in a court of justice to make disclosures.” Therefore we hold that there was no error in requiring or permitting the disclosure. As to the second point, as the statute does not require the testimony of witnesses before the grand jury to be reduced to writing and as it appeared that all of appellant’s testimony was not reduced to writing, there was no error in permitting the grand juror to detail it orally.
The statute requires the grand jury to select one of their own number as clerk and requires him to “take minutes of their proceedings * * * and also of the evidence given before them; which shall be preserved for the use of the prosecuting attorney, to sub-serve the purposes of justice.” Section 1724, Burns’ R. S. 1894 (1655, R. S. 1881).
The word minute is defined by Webster to be a small portion; to set down a short sketch or note of; to jot down; to make a brief summary of.
It is thus made apparent that the legislature did not intend to require that the grand jury should write down the evidence in full of witnesses that testify before them. Nor does it require such minute to be signed by the witnesses testifying before them. The rule here is entirely different from that prescribed by the statute for the testimony of witnesses before the coroner. There, the statute requires all the testimony *376 to be reduced to writing and subscribed by the witnesses respectively. And the coroner is required to return such written testimony into the circuit or criminal court. Section 7956, Burns’ R. S. 1894 (5880, R. S. 1881). The cases cited, upon the questions now before us, by appellant’s counsel, namely, Wood v. State. 63 Ind. 353; and Robinson v. State, 87 Ind. 292, apply only to the testimony of witnesses examined before the coroner and have no application to the testimony of witnesses before the grand jury. The circuit court did not err in admitting such oral testimony.
Another error alleged in the motion for a new trial is the misconduct of the juror Surber. On his voir dire-he stated that he had formed an opinion as to the guilt or innocence of the appellant, but the effect of the whole examination was that such opinion would readily yield to the evidence so that he was accepted without challenge on either side. But two affidavits were filed in support of that specification of the motion to the effect that previous to the trial a very short time, he had stated that he believed appellant had murdered his wife, and that he ought to be hung/and that no amount of evidence short of a confession that some other person did the deed, would be sufficient to convince Mm that appellant did not murder his wife. The juror explicitly denied under oath the making of each and every one of these statements.
It is thoroughly settled in this State that where there is a conflict in the sworn statements before the trial court upon questions of this kind, this court can no more attempt to weigh such conflicting statements or affidavits than it can settle a conflict of evidence on, a trial of a cause. The sworn statement of the juror fully and unqualifiedly denies all misconduct and directly contradicts every charge of misconduct on his *377 part. It was the exclusive province of the trial court who heard and saw the juror and the other witnesses to determine where the preponderance was. And that court having decided the question, this court cannot re-weigh such evidence. Spicer v. Hoop. 51 Ind. 371, 372; Schnurr v. Stults, 119 Ind. 429; Louisville, etc., R. W. Co. v. Hendricks, 128 Ind. 462, 466; Home Electric Light and Power Co. v. Globe Tissue Paper Co., 146 Ind. 673.
Conflicting evidence on the question of the alleged misconduct of a juror must be decided on the weight of the evidence. And the conclusion arrived at by the trial court as to such misconduct must be respected in a criminal case as much by this court as it respects the decision of a question of fact upon conflicting evidence in a civil action. Holloway v. State, 53 Ind. 554; Doles v. State, 97 Ind. 555; Weaver v. State, 83 Ind. 289; Epps v. State, 102 Ind. 539; Long v. State, 95 Ind. 481-486; Clayton v. State, 100 Ind. 201; Keyes v. State 122 Ind. 527; Smith v. State, 142 Ind. 288.
Appellant complains of instruction No. 10, given by the court on its own motion, reading as follows: “The doctrine of reasonable donbt as a general rule has no application to subsidiary evidence taken item by item. It is applicable to the constituent elements of the crime charged and to any fact or facts which constitute the entire proof of one or more of the constituent elements of the crime charged. That is to say, all the facts which must have existed in order to make out the guilt of the accused must be established beyond a reasonable doubt before you can convict. But the rule of reasonable doubt does not apply to subsidiary and evidentiary facts, that is to say, to such facts and circumstances in evidence, if there be any such, as are not essential elements of the crime charged, and not necessary to the proof thereof, and when considered *378 together and as a whole, tend to prove or disprove the existence of one or more of the primary facts necessary to make out the offense. Subsidiary and evidentiary facts may be considered by you in determining the necessary and essential facts when established by clear and satisfactory proof.”
The law as laid down in Wade v. State, 71 Ind. 535, fully justifies the court in giving the above instruction. The court had already instructed the jury that the evidence must be such as to convince them beyond a reasonable doubt of the defendant’s guilt before they could convict him. Appellant’s counsel concede that the court had properly instructed the jury upon that subject in previous instructions, but insist that the instruction quoted is erroneous. If the instruction were not the law, then the forcé which the law recognizes may be derived from the addition of circumstances in evidence to each other, or the combination thereof will be wholly lost. Because, as we have before said, a single circumstance in evidence may amount to little or nothing by itself, and yet, when combined with other circumstances, that circumstance may be greatly increased in the strength of the proof it affords, and the other circumstances to which it is added may likewise be greatly increased in probative force as evidence by such combination or addition, so that the mind is carried to the conclusion that the fact to which they all point is true beyond a reasonable doubt. As was said in the case last cited above: “To illustrate: Malice and premeditation are essential ingredients in the crime of murder in the first degree. The proof of these of course is various, according to the circumstances of different cases. It often consists in proof of declarations of the accused, made at the time of, before or after the homicide. The proof may consist of declarations claimed to have been made at *379 different times and places* * * * Each witness may be to some extent discredited, and a reasonable doubt thrown on his testimony, standing alone, and yet the combined effect of the testimony of all the witnesses may constitute proof beyond a reasonable doubt of the alleged ultimate fact of malice or premeditation. While the testimony of each of these witnesses, standing by itself, is in some degree doubtful, yet, all viewed together, though each has reference to a declaration distinct from all the others, they become mutually corroborative, and constitute within the meaning of the criminal law, indubitable proof of the final inference. * * * Must the jury be directed to take the evidence of the State, piece by piece, and reject every part in which a flaw may be fonnd? It is good military strategy to divide and conquer. It is not a sound or just rule which requires the prosecution in a State case to make a voluntary division of its forces so that they may be beaten in detail.”
And so we say it is not the law that the jury in a criminal case must take the evidentiary facts piece by piece and consider each item separate and apart from the other items or the whole evidence, and if each piece or item standing alone does not appear to be true beyond a reasonable doubt it is to be rejected. That is what appellant’s contention amounts to on the question as to the correctness of said instruction. But they say the instruction is bad for another reason, namely: because the court did not tell the jury what was “subsidiary facts,” “evidentiary facts” and “essential elements of the crime charged.” That objection is a concession that the instruction was correct as far as it went, but that it did not go far enough to define what was meant by those terms. It is thoroughly settled that an instruction objected to because it does not go far enough, is not an available error un *380 less the complaining party tenders an instruction to the court covering the omitted ground and the court refuses to give it, to which refusal there is an exception. Behymer v. State, 95 Ind. 140; Powers v. State, 87 Ind. 144.
But we are asked to overrule the1 Wade case because, as is claimed by appellant’s counsel, it is unsound, and because it was an opinion by a divided court, Judge Elliott having dissented, though without a dissenting opinion. The case, however, has been since expressly followed by this court, Judge Elliott delivering the opinion, in the course of which, speaking for the court he says: “It is necessary that every fact which constitutes an essential ingredient of a crime charged against an accused should be proved beyond a reasonable doubt, but it is not necessary that incidental or subsidiary facts should be proved by such a degree of evidence in order to entitle them to the consideration of the jury. Wade v. State, 71 Ind. 535. Evidence is not to be considered in fragmentary parts and as though each fact or circum.stance stood apart from the others; but the entire evidence is to be considered and the weight of testimony to be determined from the whole body of the evidence. A circumstance considered apart from the other evidence may be weak, if not improbable, but when viewed in connection with surrounding facts and circumstances may be so well supported as to remove all doubt as to its existence as. detailed by the witness. Acts considered apart from all other evidence may appear innocent but when considered with other evidence may import guilt.” Goodwin v. State, 96 Ind. 550-570. To the same effect are Behymer v. State, supra; Koerner v. State, 98 Ind. 7; Davidson v. State, 135 Ind. 254; Hauk v. State (Ind. Sup.) 46 N. E. 127.
Therefore the rule laid down in Wade v. State, supra, *381 is so thoroughly established that it would require very cogent reasons to justify the overthrow of that rule. No such reasons have been presented nor do we know of any. On the contrary, the rule seems well founded on principle and authority. State v. Hayden, 45 Iowa 17; Jamison v. People, 145 Ill. 380, 34 N. E. 486; State v. Crane, 110 N. C. 536, 15 S. E. 231; Fowler v. State (Ala.), 14 South. 860; Starkie on Ev., 855.
Complaint is made of the following instruction, No. 12, given by the court: “The defendant in a criminal case is not required to satisfy the jury of the existence of any fact, which, if true, is a complete defense. It is sufficient if he create in the minds of the fury a reasonable doubt of the existence of such fact.” The part of the instruction down to the first period was asked by the appellant, and the court added the closing sentence which is italicised. The court having fully and correctly instructed the jury to the effect that the defendant must be acquitted unless the State affirmatively proves him guilty beyond a reasonable doubt, it seems quite impossible that this instruction could have been understood by the jury, as appellant’s learned counsel insist, that it “places the burden on the defendant to create a reasonable doubt.”
The instruction, however, is correct as an abstract proposition of law. It is a correct statement of the law as applicable to an affirmative defense in a criminal case and not to the law arising upon a defense negative in its character. An affirmative defense is such as where the defendant attempts to establish his insanity when he did the act with which he is charged, or that he was acting in his necessary self-defense when he did it and the like. In such cases he is not required to satisfy the jury of the existence of either of those facts, but it is sufficient if the evidence tending to prove such facts create in the minds of the jury *382 a reasonable doubt of the existence of any such fact. That is, if the defendant in seeking to prove his insanity as a defense at the time he did the act charged, fails to satisfy the jury of the existence of that fact, yet if by such evidence he creates a reasonable doubt in the mind of the jury of his sanity at the timé he did the act, it is sufficient to make out his defense. Trogdon v. State, 133 Ind. 1.
It is to be observed that no objection is made against this instruction by the appellant on the ground that it is not applicable to the evidence. Indeed, appellant is estopped from making such an oN jection because his counsel concede that they asked the court to give the first part of it. That part as already observed had exclusive reference to an affirmative defense, and as such was imperfect without the addition which the court made to it. The addition made it a correct statement of an abstract proposition of law. There was no available error in giving the instruction as modified. Indianapolis, etc., R. W. Co. v. Watson, 114 Ind. 20; Deig, Exr., v. Morehead, 110 Ind. 451.
The last instruction .given by the court on its own motion is complained of as reading as follows: “The duty of counsel and the court has now been performed. The counsel engaged in this case have been untiring in their efforts to bring before you all possible evidence that may aid you in arriving at the truth. They have ably assisted you in applying the evidence to facts in contention. The court has endeavored to rightly advise you in the law, and now there confronts you the final and important duty of pronouncing upon the guilt or innocence of the defendant. I submit this casé to you with the confidence that you will faithfully discharge the grave duty resting upon you without upon the one hand of being moved by any undue de *383 mand for conviction on the part of counsel for the State, or being swayed from its right performance by any undue appeal to your sympathies. You will bear in mind that neither the life nor the liberty of the accused may be trifled away, and neither taken by careless or inconsiderate judgment. But, if after a careful consideration of the law and the evidence in the case, you are satisfied beyond a reasonable doubt that the defendant is guilty, you should return your verdict accordingly. Duty demands it and the law requires it. You must be just to the defendant and equally just to the State. As manly, upright men charged with the responsible duty of assisting the court in the administration of justice you will put aside all sympathy and sentiment, all consideration of public approval or disapproval, and look steadfastly and alone to the law and evidence in the case and return into court such a verdict as is warranted thereby.” Among the objections urged to this instruction by the appellant’s learned counsel is that “it is a call, a trumpet blast to conviction.”
An instruction involving the same sort of generalization was upheld by this court in Lynch v. Bates, 139 Ind. 206-208; and in Stout v. State, 90 Ind. 1-13. Indeed, the only proper test we know of by which to determine whether the instruction amounts to error prejudicial to the rights of the appellant is the answer to the question: Would the appellant’s legal rights in any way be invaded, impaired, or infringed by the jury strictly following the instruction in the consideration of the case? The question admits of no other than, a negative answer if we confine ourselves to the language of the instruction. We need scarcely say that we are bound to presume in the absence of a contrary showing in the.record that the jury would and *384 did strictly obey and follow the instruction. Therefore there was no available error in giving it.
The refusal to give instruction No. 11, tendered by the defendant is complained of, reading thus: “It is not sufficient that the evidence clearly, establishes that Thurza Hinshaw was feloniously killed, and that upon the evidence the mysterious crime of her killing can not be solved from the evidence except upon the supposition of the defendant’s guilt. The life or liberty of a person cannot be legally sacrificed on the ground that only by regarding him as guilty upon the evidence adduced, an explanation is afforded of the perpetration of a crime, however clear it may be that a crime has actually been committed. The circumstances surrounding the person charged must point beyond any other reasonable solution to his guilt.” Instead of giving the above, the circuit court gave the following instruction: “To warrant'a conviction the State is required to prove beyond a reasonable doubt that the defendant feloniously killed his wife, Thurza Hinshaw, at the time and place and in the,manner and form as alleged in the indictment. It- is not sufficient if the State had enveloped the death of Thurza Hinshaw in mystery that is incapable of explanation without inferring the defendant’s guilt. To convict, the State is required to explain all mystery, sufficiently to remove all reasonable doubt, and establish facts that are susceptible of explanation upon no reasonable hypothesis consistent with the defendant’s innocence, and that point to his guilt beyond any other reasonable solution and beyond all reasonable doubt.” The instruction given covers all that is covered by the one refused, and is fully as favorable to the defendant if not more so. Under such circumstances, appellant has no cause for complaint because the court is not required to repeat an instruction or to give the law to *385 the jury in the particular phraseology which the defendant sees fit to request. All the court is required to do is to express the law in its own language. Trogdon v. State, supra.
The refusal to give instruction No. 14 tendered by appellant is also complained of. That instruction was to the effect that unless the jury were affirmatively satisfied beyond a reasonable doubt that the blood stains on the block of wood taken from the wood-house examined and testified about by Dr. Geis came upon such piece of wood on the night Mrs. Hinshaw was killed, the jury should not consider his evidence or give it any weight whatever.
This instruction was rightly refused if instruction ten, given by the court, was correctly given, and we have held it was. The tendered instruction 14, in effect *says, unless the evidentiary or subsidiary fact that the blood stain came upon that piece of wood the night that Mrs. Hinshaw was killed, considered by itself, does not appear beyond a reasonable doubt, that all evidence concerning such blood stain cannot be considered at all. That blood stain was only one circumstance in evidence in the case. Of itself, it had very little or no probative force whatever, but connected" with other circumstances in evidence, the inference that it came there that night might have been greatly strengthened. In short, it was a subsidiary or evidentiary fact which the law, as we have seen, does not require to be proven beyond a reasonable doubt. It was not a constituent element or ingredient of the crime charged which alone must be proven beyond a reasonable doubt. Hence there was no error in the refusal of the instruction.
Complaint is made of the refusal to give instruction 221-2 tendered by the appellant. That is the first part of instruction No. 11 given by the court with the addi *386 tion thereto which the court made. What we have said of that instruction disposes of the question raised by the exception to such refusal. Thus we have patiently gone over every question properly presented in this vast record and find no available error in overruling the motion for a new trial.
Therefore, the judgment is affirmed.
Monks, J., took no part in this decision.