## WHITE *v.* THE STATE.

[No. 18,313.   Filed Oct. 6, 1899.   Rehearing denied Jan. 10, 1900.]

APPEAL AND ERROR.—*Bill of Exceptions.—Evidence.—How Made Part of Record.—Act of 1897.*—The evidence is properly in the record, under the provisions of the act of 1897 (Acts 1897, p. 244) where the bill of exceptions containing the evidence was properly certified by the judge as a true bill of all the evidence, and filed with the clerk within the time allowed by the court, although the record does not show that the longhand manuscript was filed in the clerk's office before being incorporated in the bill of exceptions. *p. 690.*

INSTRUCTIONS. — *Evidence. — Weight.—Criminal Law.—Words and Phrases.*—A statement in an instruction that "there is some evidence tending to show" a particular fact, is equivalent to a statement that evidence had been given relating to such fact, and no error was committed in using such statement in an instruction in the trial of a criminal cause, where evidence relative to such fact had been given, and its weight was left to the jury.   *pp. 690–693.*

SAME.—*Words and Phrases.—Presumption.—Criminal Law.*—It will be presumed in the absence of any showing to the contrary that words used in an instruction in the trial of a criminal cause were used and understood by the jury in their ordinary and usual sense. *pp. 691, 692.*

SAME.—*Evidence.—Criminal Law.*—In the trial of a murder case a police officer testified that he was present at a conversation between the accused and his son a few days after the homicide, and after the arrest, in which the son said that a handkerchief found near the place where the murder was committed belonged to his father, and the officer did not remember any reply made by the accused. *Held,* that the evidence warranted the giving of an instruction that there was some evidence tending to show that accused made no reply to the statement made by the son.   *pp. 693, 694.*

From the Tippecanoe Circuit Court.   *Affirmed.*

*R. P. DeHart* and *C. E. Lake,* for appellant.

*Wm. A. Ketcham,* Attorney-General, *C. E. Thompson* and *D. E. Storms,* for State.

HADLEY, J.—Upon a proper indictment, the appellant was convicted of murder in the first degree, and sentenced to

life imprisonment. The only error he assigns here is the overruling of his motion for a new trial; and the only question presented involves the correctness of the seventeenth instruction given to the jury.

The State's attorney makes the point that the evidence is not in the appeal for failure of the record to show that the longhand manuscript of the shorthand notes was filed in the clerk's office before it was incorporated into the bill of exceptions. The record shows that the bill of exceptions, containing the evidence, etc., was properly certified by the presiding judge as a true bill of all the evidence, etc., given in the cause, and that the bill thus verified was filed in the clerk's office August 15, 1896, within the time allowed by the court.

This appeal was filed in this court June 11, 1897, after notice to appellee, and, under the provisions of the act approved March 8, 1897 (Acts 1897, p. 244), the evidence is properly in the record.

The instruction objected to is as follows: "There is some evidence tending to show an identification by a third person, in the presence of the accused, of a certain article, or articles, as belonging to the accused, and some conversation, or statement, or expression, made in his presence in relation thereto, and tending to connect him with the crime charged, and that when such alleged identification was made, and such conversation or statements were had, the accused made no reply. It is for you to determine the weight you will give to such identification, if any such was made. If there is some doubt as to whether such article, or articles, were the property of the defendant, you should give him the benefit of the doubt. To affect a party with the statements of others, on the ground of his implied admission of their truth, by silent acquiescence, it is not enough that they be made in his presence; the circumstances must not only be such as afford him an opportunity to act or speak, but such as would properly and materially call for some action or reply from one similarly

situated. It is for you to determine, from the evidence, if such article or articles were identified by a third person as belonging to the defendant. If the same did belong to the defendant, what statement or expressions, if any, were made in the presence of the accused, and under what circumstances. In determining the weight which you will give to the testimony in this particular you must consider, among other facts and circumstances, whether the accused heard such alleged identification, conversation, statements, or expressions, and fully comprehended their import and effect. If his attention was called to the fact of the alleged identification, if he was under arrest at the time, if so, did he have counsel or not, and all the circumstances surrounding him at the time, and whether or not, from all the facts and circumstances, as appearing from the evidence, and from his situation, at the time he was called upon for some action or reply. You are the judges of the weight and significance you will give to his alleged acquiescence or silence."

It is affirmed: (1) That it was error for the court to state to the jury that "there was some evidence *tending* to show," etc., the argument being that it is the exclusive province of the jury to determine for themselves what the evidence tends to prove; (2) that the instruction contained a misstatement of the evidence prejudicial to the defendant.

It is not error for the court to state to the jury self-evident facts; nor to assume a fact as true that has been conclusively proved. *Astley* v. *Capron*, 89 Ind. 167; *Simpkins* v. *Smith*, 94 Ind. 470. And it is harmless to state that a certain question is the controlling one if, upon the evidence, it alone is fairly debatable. *Jones* v. *State*, 78 Ind. 217; *Browning* v. *Hight*, 78 Ind. 257; *Sedgwick* v. *Tucker*, 90 Ind. 271, 281.

The statement that there has been evidence "tending to show" a particular fact, is equivalent to a statement that evidence has been offered relating to such fact. The force

and effect of the evidence is in no sense suggested by the term. How slightly or how strongly the evidence tended, etc., or whether it tended at all to effect a conclusion, is expressly left to the jury in these words of the instruction complained of: "It is for you to determine the weight you will give to such identification, if any such was made. If there is some doubt as to whether such article, or articles, were the property of the defendant, you should give him the benefit of the doubt." Again, "It is for you to determine, from the evidence, if such article, or articles, were identified by a third person as belonging to the defendant. If the same did belong to the defendant, what statements, or expressions, if any, were made in the presence of the accused, and under what circumstances."

As said in *Smith* v. *State*, 142 Ind. 288, 291: "The manifest purpose of the instruction was, therefore, to point out the nature of the evidence, and to limit the consideration to which it was entitled by the jury. This was strictly the province of the court. Indeed, the court, in the very act of permitting the introduction of any item of evidence, must of necessity pass upon its tendency. If the evidence offered does not tend to prove any material issue in the case, or to impeach a witness, or to serve any other legitimate purpose of the trial, the court must exclude it. This is not weighing the evidence, but it is passing judgment upon the tendency, character, or purpose of the evidence."

The word "tending" has not that elastic meaning attributed to it by the appellant's counsel, nor has it a signification in judicial proceedings different from its common and ordinary use. In its primary sense it means direction or course towards any object, effect, or result—drift. Webster's Inter. Dict. 1484. And it must be presumed, in the absence of any showing to the contrary, that the jury understood the term in its usual and ordinary sense and that it was not applied in any way harmful to the appellant.

But it is said that the instruction contains a misstatement of the evidence prejudicial to the defendant, in this, that it assumed without ground that evidence had been introduced tending to show that the appellant made no reply when a handkerchief was identified, as belonging to him, by his son. At a point upon the direct route from the residence of the deceased to that of appellant was found a red handkerchief; a few feet from which point, and on the opposite side of the fence in an orchard and among some briars was found the pocket-book and private papers of the deceased.    Concerning this handkerchief the superintendent of police testified that a few days after the homicide, and after appellant's arrest therefor, in a conversation he heard between appellant and his son Frank White at police headquarters, Frank said, referring to the handkerchief found in the orchard, that was the handkerchief his father had had; and witness did not remember what reply the father made.    Neither appellant, who was a witness in his own behalf, nor any other witness testified that he did make a reply.

It is argued that the testimony of the witness that he did not remember what reply White made furnished no warrant for the court's statement that there was "some evidence" tending to show silence.    We are unable to agree with appellant.    The police officer according to his testimony was present at a conversation between the father and son—a conversation that related to an evidence of guilt against the father, a conversation and subject that should concern and impress an officer of the law sufficiently to enable him to recall its important features within so short a period.    A statement that he did not remember any reply is not proof that some reply was made; nor is it proof that no reply was made.    In short, it is proof of nothing.    But the fact that the officer was present and heard so important a conversation, and did not remember any reply of the accused to such an incriminating statement, and the natural and reason-

able inference that may arise therefrom, tends, in some degree, at least, to show that no reply was made. And evidence of slight weight is some evidence. After a careful consideration of the instruction as a whole, we are assured that the appellant has not been injured thereby, and it may well be questioned whether the statement that if some doubt existed as to whether the handkerchief was the property of the defendant, the jury should give him the benefit of the doubt, was not more favorable to the defendant than he was entitled to. Rains v. State, 152 Ind. 69, 72; Hinshaw v. State, 147 Ind. 334, 379. In the last clause of the instruction the jury were cautioned that they were the judges of the weight and significance they should give to White's alleged acquiescence or silence. Moreover, in number nineteen, the jury are told: "You are to determine the weight to be given to all the evidence introduced, which tends to prove or disprove any confession or admissions made by the defendant, and every fact and circumstance in the case. It is for you to determine whether any confession or admission or either, or both, has been made by the defendant, and if so, what weight you will give the same, and to determine what facts and circumstances are proved and weight you will give to the same, bearing in mind that each and every material fact and circumstance necessary to conviction must be proved beyond a reasonable doubt."

The undisputed evidence in the record shows that the deceased, Hester Curtis, a woman sixty-nine years of age, resided alone in an isolated spot in the city of Lafayette. She was found dead in her house, in the afternoon of December 22nd, from frontal wounds on the face and head that might have been produced with a hatchet and could not have been self-inflicted. She was a woman of strong character and attended to her own affairs. It was known to White that she had money, and that a few days previous to her death she had been negotiating for the purchase of

property. White was a drinking man, and lived about four blocks from the home of the deceased. A red handkerchief was found about midway between the homes of White and the deceased that was identified by his son as being one that White had had; and a few feet away from where the handkerchief was found, but over the fence in an orchard and among some briars, was found the pocket-book and private papers of the deceased.

A companion in jail, whose reputation for truth was unassailed, testified that, after White's arrest and incarceration, he told witness that on the day of the homicide he had been about town drinking heavily, and that when he got in that condition he would get it in his head he could borrow money of the deceased; that he had been up to see her two or three times to borrow money and that she had refused; and that he went there that night prepared to get it. Before going to her home, he went to his own and got a hatchet, removed the handle which was loose, and placed the hatchet in his pocket; that the night was dark and rainy. Just before he reached the house of deceased, he saw a woman coming up the street toward him. He went across the street and when the woman had passed by he went over and into the yard of the deceased. After entering the yard, he drank the last of some whisky and threw the bottle down. (A bottle was afterwards found in the yard). He then entered the house and the deceased asked him what he wanted. He told her he had come to borrow money. She told him she had no money; that her money was all in the bank. He told her that he knew that she had drawn it out. She then got her bank-book and showed it to him. (When found dead her bank-book was in her hand.) He told her that she had money in the house and he wanted it. She then started for the back door and said she would call the neighbors. He followed her, caught her in the kitchen and, when she began to scream, he caught her by the throat and choked her to keep her still. (Her false teeth were found on the kitchen

floor.)   He pulled her into the sitting-room (where her body was found) and struck her three or four times with his fists; then took the hatchet from his pocket and struck her with the side edge three or four times in the face and on the head; then caught it by the pole and struck her with the sharp edge.   She then sat back in the chair like she was dead, and he then hurriedly searched the house, turned out the light and went away; that he went home and washed the blood off his hands; that he was lucky not to get blood all over him "because the blood just flew" when he struck her with the sharp edge of the hatchet. (Blood was sprinkled on the ceiling near where the body was found.)   That on the way home he threw away the pocket-book and papers.

Laura Rutherford testified that, as she passed the Curtis place about 8:30 p. m., she saw a man in the street; that it was too dark to identify him.   She ran by and, having passed a considerable distance, she looked back and saw the man go from the street into the Curtis yard and saw a light in the Curtis house.

A hatchet without a handle and with a battered and rough-faced pole was found in White's rain-barrel, and blood was found in the water of the barrel.   In the top of the skull, which was in evidence, appeared a puncture, irregular in shape, into which the battered pole of the hatchet, in all of its irregularities, would exactly fit.

The jury was warranted in believing many other incriminating facts and circumstances in evidence, and, after giving patient examination to the voluminous record, we have reached the conclusion that there is no available error in the record, and that, under the evidence, the verdict and judgment are manifestly right.   The judgment is therefore affirmed.