OSBON v. STATE OF INDIANA.

[No. 26,935. Filed March 1, 1938.]

*Robert O. Hillis, Jr., Howard Meyer, Jenkins & Jenkins, George W. Kassabaum,* and *Charles Siferd,* for appellant.

*Omer S. Jackson,* Attorney-General, *A. J. Stevenson,* Assistant Attorney- General, and *R. W. Scowden,* and *James P. Wason,* for the State.

HUGHES, J.—The appellant was indicted by the White County Grand Jury for the murder of one Kenneth Roth and was found guilty by a jury of second degree murder and his punishment was fixed at life imprisonment. There are two counts of the indictment.

The errors relied upon for reversal are as follows: 1. The court erred in overruling appellant's motion to quash count number one of the indictment herein; 2. the court erred in overruling appellant's motion to quash count number two of the indictment herein; 3. the court erred in overruling appellant's motion to quash the indictment herein; 4. the court erred in overruling the appellant's motion in arrest of judgment; 5. the court erred in overruling appellant's motion for a new trial.

In the motion to quash each count of the indictment it is charged: a. That the grand jury which found said counts had no legal authority to inquire into the offense charged; b. the facts stated do not constitute a public offense; and, c. that the offense is not charged with sufficient certainty.

In appellant's motion in arrest of judgment it is charged: a. That the grand jury had no legal authority to inquire into the offense charged by reason of said offense not being within the jurisdiction of the court within and for which the said grand jury was impaneled, charged, and sworn; b. that the facts stated in said indictment do not constitute a public offense under the laws of the State of Indiana; c. that the facts stated in each count do not constitute a public offense under he laws of the State of Indiana.

The reasons assigned in the motion for a new trial are that the verdict of the jury is contrary to law and is not sustained by sufficient evidence.

Count number one of the indictment is as follows:

"The grand jurors of White County in the State of Indiana, good and lawful men, duly and legally empaneled, charged and sworn to inquire into felonies and certain misdemeanors in and for the body of said County of White, in the name and by the authority of the State of Indiana, on their oath present that one Wilfred Ayde Osbon, late of Carroll

County on the 17th day of March, A. D., 1935, at and in Carroll County and State aforesaid, did then and there unlawfully, feloniously, purposely and with premeditated malice, kill and murder one Kenneth Roth, by then and there feloniously, purposely, and with premediated malice, unlawfully administering to the said Kenneth Roth a certain deadly poison, commonly called strychnine, which the said Kenneth Roth then and there received at the hands of the said Wilfred Ayde Osbon, and which he, the said Kenneth Roth, then and there swallowed, and by reason of which he then and there died in White County, Indiana, on March 17, 1935; he, the said Wilfred Ayde Osbon, then and there well knowing said strychnine to be a deadly poison and wickedly intending then and there and thereby unlawfully, feloniously, purposely and with premeditated malice to kill and murder the said Kenneth Roth, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Indiana."

Count number two of the indictment is in substance the same as count number one except it is alleged in count number two that the murder was without premeditation.

It is insisted by the appellant that each count of the indictment is fatally defective by reason of repugnancy in that it is charged in the indictment, "That one Wilfred Ayde Osbon late of Carroll County on the 17th day of March, 1935, at and in Carroll County and State aforesaid, did then and there unlawfully, feloniously, purposely and with premeditated malice kill and murder one Kenneth Roth and by reason of which he then and there died in White county, Indiana, on March 17, 1935." We do not believe that the foregoing allegations are so repugnant as to be sufficient grounds to quash the indictment. Section 9-1127 Burns 1933, §2206 Baldwin's 1934, provides "No indictment or affidavit shall be deemed invalid, nor shall the same be set aside or quashed, nor shall trial, judgment or other

proceeding be stayed, arrested or in any manner affected for any of the following defects: . . . Sixth. For any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged. . . . Tenth. For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant on the merits." And Section 9-211 Burns 1933, §2020 Baldwin's 1934, provides: "If any mortal wound be given or poison administered in one county and death by means thereof ensues in another the jurisdiction thereof is in either county." There can be no question that there is sufficient matter to indicate the crime and person charged. And the language of the counts of the indictment is sufficiently clear to show that it is charged therein that the poison, strychnine, was administered and given to Kenneth Roth in Carroll County, Indiana, and that by reason thereof he died in White County, Indiana. The substantial rights of the defendant on the merits of the case were not affected. No error was committed by the court in overruling the motion to quash the indictment or either count thereof. There is no merit in appellant's motion in arrest of judgment. It was properly overruled.

The 5th error assigned for a reversal is that the court erred in overruling appellant's motion for a new trial for the reason that the verdict is not sustained by sufficient evidence and is contrary to law.

The evidence given at the trial is in substance as follows. The appellant and his wife, Allene Osbon, lived in their cottage on Lake Freeman which is in Carroll County, Indiana. The cottage was built by them in 1929; they were living at this time in Indianapolis, and made frequent visits to the cottage until January, 1933, when they made it their permanent home. Harrison Roth and Margaret E. Roth were the

parents of Kenneth Roth, and Edwin Roth, the younger brother of Kenneth. Kenneth Roth was twenty-one years of age; the appellant was fifty-eight, and his wife, Allene, was forty-four years of age. The Roths lived about one mile and a quarter from the Osbons on March 17th, 1935, but at one time lived in a cottage within two hundred feet of the Osbon cottage on the lake. During this time and up to the time of the death of Kenneth Roth the families were on a friendly relationship. The evidence shows that in February, 1933, when the families were living at the lake, the appellant and Kenneth had some bitter words and the appellant told him to get off of his lot. Within a short time, however, they were again friendly and, as far as the evidence shows, remained so, until the death of Kenneth. Kenneth worked at various times on the Osbon automobile and in return Mrs. Osbon would do typewriting for him. He and his brother, Edwin, visited the Osbon home at different times and often would enter the home without knocking. Kenneth and the appellant visited Indianapolis together on two different occasions. On one of the trips, Kenneth took the appellant in Kenneth's car, and on the other Osbon took Kenneth in Osbon's car. On Friday afternoon, March 15, 1935, the Osbons went to the Roth home to listen over the radio to the basketball game. Kenneth and Edwin Roth were present and there is no evidence to show that the relationship between all the parties was other than friendly. On Sunday morning, March 17, 1935, Edwin Roth was at the home of the Osbons and asked permission to use Mrs. Osbon's typewriter. She told him that he was welcome to use it and he was to return that afternoon to do so. At that time the appellant made a remark that he wanted to see Kenneth about riding to work with him on Monday morning.

On the morning of the fatal day in question the appel-

lant and his wife had breakfast about 9:00 o'clock. Mrs. Osbon prepared some soup from cold-packed meat and vegetables which had been canned by her and a neighbor lady the year before. She put it in a roaster and placed it on a heating stove. This was to be their noon meal. About noon or shortly after, Mr. and Mrs. Osbon, in an old Buick car, drove to a new bridge then being constructed across the Tippecanoe river at the edge of Monticello. The appellant talked to some workman. He left this place at about 2:30 p. m. and stopped at the Harrison Roth home. He got out of his car, went to the door, knocked and asked for Kenneth. He learned from Mrs. Roth that Kenneth had gone to the park. The appellant testified that he wanted to see Kenneth about riding with him to Delphi on Monday. From the Roth home, the appellant and his wife drove toward their home when they met Kenneth. He got in the appellant's car and went home with them. After reaching their home, Mrs. Osbon warmed the vegetable soup which she had prepared in the morning. While the soup was being prepared Kenneth was in the living room looking at the funny papers. When the lunch, which consisted of soup, crackers, and coffee, was ready for serving, Kenneth was invited to eat with them. All three partook of the lunch and each had a second helping of soup. The appellant had nothing to do in preparing the soup other than possibly getting some potatoes from the cellar.

After the meal was served the appellant told Kenneth that they were going up to the lake to look for some cedar logs and he was invited to go with them. Mrs. Osbon gave him a heavy overcoat. She was dressed in heavy clothes and overalls, and the appellant wore heavy clothes and leather boots. Upon leaving the Osbon cottage, Kenneth said he would get his oars while the appellant got the boat ready. Kenneth was gone ten or

fifteen minutes. Upon reaching the boat Mrs. Osbon and Kenneth seated themselves on the rear seat and Mr. Osbon was in the center rowing. They proceeded up the lake toward the new bridge, and when they had gone about a mile, Mr. Osbon stopped the boat at a wharf in front of a cottage named the "Gigilo" cottage. At this point all three got out of the boat, and Kenneth ran up the water's edge a short distance and picked up an object which turned out to be a red broom handle. The three of them walked north around a bayou and then down the north and east side of the lake. On the way down the shore, Kenneth picked up a root from the water's edge and peeled a part of it back with his teeth and took two bites of the root which he chewed and swallowed. Kenneth passed it to Mr. Osbon, who tasted of the tip end of the root, and then handed it to Mrs. Osbon. Kenneth remarked to Mrs. Osbon, "Take it home with you and plant it and raise some parsnips." Mrs. Osbon put the root in her pocket. They continued down the lake a short distance and then walked up the hill along the shoreline toward the new highway, then north a way, and back down the hill at the north edge of the bayou, and then back to the boat. They all got in, and Mr. Osbon started rowing. Kenneth and Mrs. Osbon were again seated in the rear end of the boat. When they had gone a way, Kenneth said, "I believe I will get down in the other end of the boat." Mr. Osbon moved over and let Kenneth pass to the front end of the boat where he vomited into the water. He continued gagging and spitting up froth and a bloody tinge. Mrs. Osbon asked whether he felt better, and he shook his head that he did. Mrs. Osbon said, "Make it all come up, Kenneth." He didn't answer her and in a minute or so said, "W. A., I wish you would take me to the bank; I want to go home." At this time they were headed in a southeasterly direction, and Mr. Osbon turned the boat at

about a 45-degree angle and went back to the nearest place on the north and east side of the lake. On the way to the shore Kenneth had a convulsion. He was seated in the front end of the boat and raised up as though he were going to move or change his position. A part of his left side and head went over into the water. At this time the boat was about a distance equal to the length of the court room from the shore. Mrs. Osbon screamed, and both Mr. and Mrs. Osbon went to Kenneth and pulled him back into the boat. Mr. Osbon held Kenneth, and Mrs. Osbon rowed to the shore where Mr. and Mrs. Osbon assisted him out of the boat and Mr. Osbon tied the boat to a stump. After getting to the shore, Kenneth said, "Let's stop here." They could feel him going into his second convulsion. At this time Mrs. Osbon left and walked and ran up the hill and across the fields to the Ike Roth home, which was about three-quarters of a mile away. She told Ike Roth what had happened and waited until he came out and got his car. They drove to the Harrison Roth home and got Mr. Roth and then drove the car down the new highway to a point about opposite to the place where she had left Mr. Osbon and Kenneth. They went back across the field, down the hill, and came to where Mr. Osbon was seated on the ground holding Kenneth in his arms. Mr. Roth, the father, tried to lift Kenneth up and asked him what was the matter. Kenneth tried to make an expression of speaking but couldn't say a word. The three men carried Kenneth up the hill and to the car where he was placed in the rear seat, Mr. Roth holding him. Mr. and Mrs. Osbon got in the front seat with Ike Roth, and they drove into Monticello. Kenneth died as they drove up the hill to the second street in Monticello, in White County. They drove first to Dr. Coffin's home, and the appellant upon going in could not find the doctor, and so they continued on to Dr. Carney's office and took Ken-

neth inside and laid him on a table. Dr. Carney pronounced him dead. Then Mr. Roth and Mrs. Osbon drove to the Roth home and got Mrs. Roth and then drove on toward the Osbon home where they found Edwin Roth, the younger son. They all returned to the Prevo undertaking home where Kenneth had been taken.

L. E. Miller, coroner of White County, and Dr. G. R. Coffin made an autopsy on the body of Kenneth. The stomach, heart, one kidney, and a portion of the brain were removed. They were placed in a glass jar and were taken to Dr. Hunter at Lafayette who is a specialist in toxicology. Dr. Hunter testified there was a pint or more of stomach contents, that he found strychnine present, but he did not make a quantitive test. He said he found enough to kill an individual weighing one hundred forty-five pounds and twenty-one years of age. Dr. Hunter turned the tissues and organs back to the coroner who turned them over to Dr. R. N. Hargar, chemist and toxicologist of the Medical School of Indiana. He made a general analysis for poison, a general search for thirty poisons which took three days. He found strychnine in the stomach. He stated the contents of the stomach delivered to him amounted to a little over one-third of an ounce, weighing about ten grams. He found four and three-tenths milograms of strychnine which was about one-fifth grain per ounce of the contents. It was his opinion that Kenneth died of strychnine poisoning.

A coroner's inquest was held by the White County coroner at which the appellant testified. Later the grand jury of Carroll County was convened. The Osbons spent nine days in jail at Delphi. The Carroll County grand jury did not return an indictment against them. They were released and returned to their cottage. Later the grand jury of White County met and returned indictments against them. While testifying before the White County coroner a dictaphone was placed

in their home by the state police with the knowledge of the prosecutor and unknown to the Osbons. A conversation between Mr. and Mrs. Osbon was taken down in shorthand and reduced to a typewritten statement. The conversation was had immediately following their return home from testifying at the coroner's inquest. The statement was introduced in evidence by the appellant.

Evidence was given by witnesses as to the nature and kind of wild root, which was called "wild-parsnip." From the evidence it appears that it was water-hemlock which has a poisonous element called cicutoxin, but the evidence shows that water-hemlock does not contain strychnine.

It must be conceded that the evidence shows beyond doubt that Kenneth Roth died from strychnine poisoning, although, as stated by Dr. Hargar, symptons of cicutoxin death have been confused with strychnine death and that an ordinary person would be confused by symptoms of water-hemlock and strychnine death. In the instant case, however, all of the expert witnesses held that death was caused by strychnine.

Who administered the strychnine to Kenneth Roth that caused his death? The burden was upon the State to prove beyond a reasonable doubt that the appellant did and the jury evidently found that there was sufficient evidence as a verdict of guilty of second degree murder was returned. If guilty at all he was guilty of murder in the first degree for it is inconceivable that if one administers wilfully and purposely a sufficient quantity of strychnine to kill another that he did it without premeditation.

The case comes to this court upon the record. The appellant insists there is no evidence to sustain the verdict, and, although this court can not weigh the evidence in arriving at its conclusion, if it finds there is no evidence contained in the record to sustain the verdict and judgment, then it not only has

the power and authority, but it becomes its solemn duty to say so and reverse the judgment.

Where is the evidence in the record to sustain the verdict and judgment in finding the appellant guilty of second degree murder and depriving him of his liberty during his life? The appellant denies that he gave or administered poison to Kenneth. Mrs. Osbon denies that she gave or administered any poison to him. There is no evidence that either of the Osbons had in their possession any strychnine and no evidence that either had even purchased any at any time or place. Where the strychnine came from was a mystery at the trial and is a mystery now. There is the possibility that Kenneth might have had it although there is no evidence to show that he did. The lips of Kenneth were closed by death. It is true that the Osbons were the last persons with Kenneth before his fatal sickness, they had the opportunity to administer poison, but the law surely exacts something more than a mere opportunity to murder before a person's life or freedom may be taken away. If mere opportunity to murder is sufficient to convict then the life and liberty of many innocent people may be easily sacrificed. The law requires more than mere opportunity. It requires evidence to prove guilt beyond a reasonable doubt. It will not permit a mere possibility because of opportunity to take life or liberty. It does not require direct evidence, but if not direct, then the circumstantial evidence must be such as to exclude every other reasonable hypothesis except that of guilt. Can it be said that the evidence excludes every reasonable hypothesis, except that of the guilt of the appellant? Would it not be just as reasonable to say that Mrs. Osbon put poison in the soup which the deceased ate and the appellant be perfectly innocent? There is no evidence that poison was put in the soup, but Mrs. Osbon had the opportunity. It is a

mere conjecture or possibility that it was done. There is no evidence that it was done and one may not be convicted on a mere conjecture or possibility.

The State, in a supplemental statement, gives twenty-five reasons to show the guilt of the appellant. We have carefully considered each one of them, but in the light of all the evidence in the case, we do not believe any of them are inconsistent with the innocence of the appellant and certainly do not prove his guilt.

There is no motive disclosed by the record for the appellant to have poisoned Kenneth Roth. We recognize that it is not absolutely necessary for a motive to be shown, but as said in the case of *People* v. *Lewis* (1937), 275 N. Y. 33, p. 42, 9 N. E. (2d) 765:

"The evidence as a whole establishes a strong lack of motive and its absence is a powerful circumstance in the excupation of the defendant where reliance is placed entirely upon circumstantial evidence to establish the crime."

Reference has heretofore been made to a dictaphone conversation between the appellant and his wife just after testifying before the coroner of White County. They did not know that a dictaphone had been place in their home by the state police. The conversation covers eight pages of the appellant's brief and we will not set it out in this opinion. There is not one word of incrimination of either of the parties in the whole conversation. Nothing fell from their lips in the conversation that would tend to show guilt on the part of either. They had returned to their home after having testified at the coroner's inquest. They were alone except for the dictaphone which had been placed in their home unknown to them. They were free, as they thought, to talk to each other in confidence. They did so and discussed what transpired at the inquest. They knew from the questions asked them that one or both of them were

suspected of giving strychnine to Kenneth Roth, but during all the conversation that night no word was spoken by either of them to indicate guilt or knowledge of guilt. In our judgment this conversation as detailed by the dictaphone, is a strong circumstance in behalf of the appellant, and evidently the State took the same view as it failed to introduce it in evidence.

The case of *Hinshaw* v. *State* (1897), 147 Ind. 334, 47 N. E. 157, has been cited by the State to support its contention in the instant case. We approve the law as stated therein, but the facts in that case are unlike those in the instant case. In that case there was a strong motive for the murder and strong circumstances of the defendant's guilt and the verdict and judgment were well founded. In the instant case, as we view it, there is no evidence to sustain a conviction other than that the appellant had an opportunity to commit the crime and as heretofore said this is not sufficient.

The appellant placed his character in evidence and a large number of witnesses testified that it was good. These witnesses came from different walks in life and from the evidence were responsible citizens. Of course, good character alone is not sufficient to establish innocence, but it tends to fortify and establish innocence. As said in the case of *Cavender* v. *State* (1890), 126 Ind. 47, 49, 25 N. E. 875:

> "Now, when an accused person proves an unblemished reputation, it stands as a factor in the case, tending to fortify and establish innocence; and where the evidence against him is wholly circumstantial, and the testimony for and against him is nearly balanced, the weight of good character ought to exert a potent influence in turning the scale in his favor."

And in the same case it was further said (p. 48):

> "The true test by which to determine the value of circumstantial evidence, in respect to its suffi-

ciency to warrant a conviction in a criminal case, is, not whether the proof establishes circumstances which are consistent, or which coincide with the hypothesis of the guilt of the accused, but whether the circumstances, satisfactorily established, are of so conclusive a character, and point so surely and unerringly to the guilt of the accused as to exclude every reasonable hypothesis of his innocence. The force of circumstantial evidence being exclusive in its character, the mere coincidence of a given number of circumstances with the hypothesis of guilt, or that they would account for, or concur with, or render probable the guilt of the accused, is not a reliable or admissable test, unless the circumstances rise to such a degree of cogency and force as, in the order of natural causes and effect, to exclude, to a moral certainty, every other hypothesis except the single one of guilt."

It certainly can not be said in the instant case that, "the circumstances rise to such a degree of cogency and force, as in the order of natural causes and effect, to exclude to a moral certainty, every other hypothesis except the single one of guilt."

In the case of *Schusler* v. *State* (1868), 29 Ind. 394, the evidence was much stronger than in the instant case and the appellant contended that the evidence did not sustain the finding of the jury. The court said (p. 395) :

"That the deceased, one *John Frederick,* came to his death by violence is conclusively shown; that the death was caused by the appellant is attempted to be established by circumstantial evidence. To sustain such a conviction, the facts proved must be susceptible of explanation upon no reasonable hypothesis consistent with the innocence of the person charged. Although the mysterious crime cannot be solved from the evidence, except upon the supposition of the defendent's guilt, still a conviction cannot follow. The life or liberty of a person can not be legally sacrificed on the ground that only by regarding him as guilty an explanation is afforded of the perpetration of a proved offense."

As heretofore stated, we have no power to weigh evidence and determine the proved facts when a sustantial

conflict is found to exist. In the instant case there is no conflict in the evidence as to the guilt of the appellant; there is a total lack of evidence to sustain the verdict and judgment and in such event, as said in the case of *Wright* v. *Bertiaux* (1903), 161 Ind. 124, 129, 66 N. E. 900, ". . . it becomes the duty of the court so to dispose of the evidence—not weigh it—," and when it is thus found that there is not in the record evidence to sustain the finding of the jury and judgment of the court the cause should be reversed.

The facts in this case may furnish some grounds of suspicion of the defendant's guilt, but as a matter of law, there was no evidence to submit to the jury from which it might draw the inference of guilt beyond a reasonable doubt.

The judgment is reversed with instructions to grant a new trial.

The clerk of this court is directed to issue the proper order for the return of the prisoner to the custody of the Sheriff of White County, Indiana.

Judgment reversed.