BYRD *v.* STATE OF INDIANA.

[No. 30,184. Filed October 15, 1962. Rehearing denied December 20, 1962.]

*Ferdinand Samper,* of Indianapolis, for appellant.

*Edwin K. Steers,* Attorney General, and *Donald L. Adams,* Deputy Attorney General, for appellee.

ACHOR, J.*—Appellant was charged by indictment with first degree murder by poisoning. A jury returned a verdict of guilty of murder in the first degree and appellant accordingly was sentenced to the Indiana State Prison for his natural life.

The sole error assigned in the motion for new trial and here relied upon as cause for appeal is that the evidence is not sufficient to sustain the verdict.

Accordingly we examine the evidence, first, to determine whether it is sufficient to prove that the decedent died as the result of arsenic poisoning, and, second, whether it is sufficient to prove that such poison was administered by the appellant with premeditated malice to kill and murder the decedent, Lois Byrd, his wife.

*One:* The evidence with respect to the cause of decedent's death most favorable to the state is as follows:

Every doctor and every lay witness who saw Lois Byrd for any extended length of time prior to her death described her symptoms as sore throat, nausea, vomiting, diarrhea, elevated temperature, numbness in the extremeties, abdominal distress, and delirium. According to Dr. Robert Forney, State Toxicologist,

---

* NOTE: This appeal was reassigned on June 28, 1962 to the writer.

these are the classical symptoms of arsenical poisoning. He testified that arsenic is a common homicidal poison because of its physical properties which make it easy to administer without arousing suspicion in the victim, and because the symptoms produced approximate those of other diseases and illnesses, which make it difficult for a doctor to diagnose. Dr. Forney further testified that arsenic is a metallic poison, and there was sufficient arsenic in the organs and tissue of Lois Byrd to have caused death. Dr. Steussey testified that from his post-mortem examination there was no evidence that Lois Byrd died of disease or natural causes.

There is evidence that the deceased received a penicillin injection sufficient to cause death in event of a reaction. However, there is evidence that such a reaction would have occurred either almost immediately or, if it were a delayed reaction, it would have been evident in the form of hives. The evidence does not indicate that such a reaction occurred.

Thus, there is substantial evidence of probative value from which the jury could draw a logical inference that Lois Byrd did, in fact, die as the result of arsenic poisoning.

*Two*: Murder by arsenic poisoning is, by its very nature, a stealthy and despicable crime. Therefore, evidence of the crime is normally circumstantial rather than direct. Nonetheless, the evidence, although circumstantial, must be sufficient to sustain the verdict.

There is evidence that the decedent first developed the more pronounced symptoms of arsenic poisoning when she was ill at her home and the appellant was cooking for her and waiting on her. Thereafter, during

her extended illness, decedent would seem to get better until the appellant would serve her, then she would vomit and become worse. After she had moved to the home of her parents, she drank a large amount of frozen orange juice, which she seemed to nourish. On one occasion, the appellant walked nine or ten blocks through deep snow, from his house to the home of his wife's parents carrying prepared orange juice in a glass jar. Within a few minutes after the deceased drank some of the orange juice, she vomited and became worse and, when she said she didn't want it, the appellant took it away with him.

On another occasion the appellant went out and got a malted milk for the deceased. After she drank a small portion of it she vomited and couldn't drink the rest of it. However, appellant had it put in the refrigerator for her. The next day appellant telephoned from his barbershop several times and asked whether she had drunk it. She did finish drinking the malt and became so ill she was taken to the hospital. She died ten days later. A chemical analysis of the Dixie cup which had contained the malt disclosed that it contained one thousand times the amount of arsenic normally found in such cups. Findings regarding a straw taken from her bedroom were similar. It can be reasonably assumed that she consumed arsenic poison in this beverage, which was given to the deceased by the appellant. This inference is further strengthened by the fact that a search of appellant's home produced one *clean* bottle which had formerly contained arsenic poison, and several dust-dovered bottles, all of which were dragged from behind the furnace in the basement. Thus, there was substantial evidence of probative value from which

an inference could reasonably be drawn that the appellant did in fact administer arsenic poisoning to his wife, and thereby caused her death.

The appellant took the witness stand in his own defense. He denied his guilt and professed his profound love and devotion for his wife. In the light of this testimony, and because the evidence of guilt was circumstantial, and because there is a noticeable lack of evidence of any motive for the killing, appellant asserts that under these circumstances he was not proven guilty beyond a reasonable doubt, and therefore that the lower court committed error in overruling appellant's motion for a new trial.

However, few rules of appellate procedure are more firmly established than this, that it is not within the province of this court, as a court of review, to weigh the evidence, whether it be direct or circumstantial. We may not say that the jury was obliged to believe or disbelieve the testimony of the appellant which was adverse to the verdict. If the verdict is supported by evidence of probative value, it is not for this court to determine whether it establishes the guilt of the defendant beyond a reasonable doubt, nor is it for this court to determine whether, in proving such guilt, the evidence excludes every hypothesis to the contrary. This is the responsibility of the jury and the trial court. This court may only determine whether there was substantial evidence of probative value from which the jury could have inferred that the appellant was guilty of the offense charged. *Christen* v. *State* (1950), 228 Ind. 30, 89 N. E. 2d 445 [and cases cited]. It is by this judicial process that the constitutional prerogative is made

effective, and that an accused be tried by an impartial jury, in event he elects to be so tried.[1]

Furthermore, appellant, in support of his argument that the verdict is not sustained by sufficient evidence, contends (1) that the evidence as to the cause of Lois Byrd's death is in doubt because of the conflicting diagnosis of the doctors who treated her prior to the time of her death; (2) that a single injection of penicillin which was administered to decedent was capable of causing her death; (3) that if she died of arsenic poisoning, many other persons had equal opportunity of administering poison to her, and (4) that there is no proof of any motive by reason of which appellant might have murdered his wife.

The first two points have heretofore been discussed. With respect to the third point, even though there was an opportunity for other persons to have

---

1. Since counsel for appellant [and the dissenting opinion by Jackson, J.] rely heavily upon appellant's testimony in the case, we note the following weaknesses in that testimony. In the course of the appellant's own testimony it was developed that although an opportunity had been given him to take a lie detector test he had declined to do so, on advice of counsel, until the time of his appearance on the witness stand when he offered to take such a test provided it would be taken "right here" in open court, which could not be permitted.

The appellant explained the purchase of the bottles containing arsenic on the ground that it had been purchased to eradicate roaches. However, the labels on the bottles described the contents only as "ANT KILLER for the control of sweet-eating ants." The labels made no reference to roaches. Appellant [who had once worked in a drug store] denied knowing that the bottles contained arsenic, although their labels clearly indicated that the only active ingredient was arsenic. Also, bearing upon this issue, is the fact that the empty bottles were secreted behind the furnace.

Furthermore, there was some hesitation, and even contradiction, in appellant's testimony with regard to the incidents during which the appellant brought the orange juice and malted milk for the decedent's consumption. These facts and the demeanor of the appellant upon the witness stand were all matters which the jury was entitled to consider and weigh in determining the credibility of appellant's testimony and the fact of his guilt.

poisoned the decedent, there is no evidence from which even an inference of such a fact might be drawn. However, even if there had been two inferences as to who caused the death, one of which implicated the appellant and one of which did not, it still would not be within the province of this court to reverse the finding and verdict of the jury for that reason.

As stated by this court in the case of *Lee* v. *State* (1901), 156 Ind. 541, 546, 60 N. E. 299, and quoted in the case of *Christen* v. *State, supra* [228 Ind. at p. 39]:

> " '. ■ Where the circumstantial evidence in a case is of such a character that two conflicting inferences may be reasonably drawn therefrom, ■ one favorable to or tending to prove the guilt of the accused, and the other favorable to his innocence, then, under such circumstances, it is not within the province of this court to determine which inference ought to have controlled the jury. The question in such a case manifestly becomes one of fact for the decision of the jury, subject to review by the trial court, and is not, as previously said, open to review on appeal. *American Varnish Co.* v. *Reed,* 154 Ind. 88; *McCaughey* v. *State, ante,* 41.' "

Concerning the absence of evidence of motive in the case, this court has stated the rule as follows:

> "With motives, in any speculative or psychological sense, neither the law, nor the tribunal which administers the law, has any proper concern. The outward *acts* of men are all that they profess, or are called upon to regulate or to punish. ... And that motives may be inferred from conduct, as well as conduct from motives, is a familiar principle in the law of presumptive evidence.
>
> So that the jury were legally justified in inferring a motive from the commission of the crime itself, if motive had been essential to make

out the crime, but it was not. . . ." *Hinshaw* v. *State* (1877), 147 Ind. 334, 364, 47 N. E. 157, 172.

Also, it has been held that motive may be inferred from the commission of the criminal act. *Evans* v. *State* (1927), 199 Ind. 55, 64, 155 N. E. 203, 206; *Morgan* v. *State* (1921), 190 Ind. 411, 417, 130 N. E. 528, 530.

There is a marked parallel between the evidence in this case and that which was presented to this court in the case of *Epps* v. *The State* (1885), 102 Ind. 539, 556, 1 N. E. 491, 501. In that case this court stated:

"It is claimed, finally, that the verdict was not sustained by sufficient evidence, and that for that reason, if for no other, the judgment ought to be reversed.

It is true, that everything which served to connect the appellant with the death of John Epps rested upon circumstantial evidence, and that the circumstances were not absolutely conclusive against the appellant, yet upon the whole evidence we see no palpable reason for doubting her guilt. The evidence tended to establish beyond all question that the deceased died from arsenical poisoning, produced by the administration of small or divided doses of arsenic; that the deceased was taken sick, with symptoms indicating the presence of arsenic in his stomach, the day after the appellant purchased arsenic as herein above stated; that the appellant cooked the deceased's breakfast and served it to him the morning he was taken sick; that she administered food and medicine to him during his sickness, having opportunities in that respect which no one else enjoyed; that she at first denied having purchased any arsenic the day before her husband was taken sick, and when confronted with the fact that she had done so, she was unable to give any account of what became of the arsenic. There were other circumstances unfavorable to the appellant which it is impracticable to

set out at length. The judgment can not, therefore, be reversed upon the evidence."

In our judicial system it is the right of every man to be tried by a jury of his peers. A defendant having elected to be so tried is bound by the decision of the jury, if convicted, unless there was no evidence of probative value from which the jury might reasonably have drawn an inference of guilt. *Christen* v. *State, supra; Myles* v. *State* (1955), 234 Ind. 129, 124 N. E. 2d 205; *Music* v. *State* (1959), 240 Ind. 54, 161 N. E. 2d 615.

Judgment is, therefore, affirmed.

Arterburn, C. J., and Landis, J., concur.

Jackson, J., dissents, with opinion.

Bobbitt, J., concurs in the dissenting opinion.

## DISSENTING OPINION.

JACKSON, J.—I dissent from the majority opinion herein for the reason that appellant's motion for a new trial, on the grounds that the verdict was not supported by sufficient evidence, and that the verdict of the jury is contrary to law, was well taken and should have been sustained.

Despite the fact that the deceased was attended by a number of physicians during her illness there was not a single one of them who testified that she was suffering from arsenic poisoning, nor in fact is there any direct evidence that she died of such poison. Dr. Steussey testified that in his opinion, based on his post-mortem examination, there was no evidence that Lois Byrd died of natural causes or of a disease. Dr. Forney, over objection of appellant, testified that there was a sufficient quantity of arsenic found in the tissues and specimens (obtained from the body of Lois Byrd) to cause death.

Thus, we are confronted with the question, did she die of poison, of the flu her mother thought she had, or did she die of the massive (400,000) units of pencillin, one-half grain of streptomycin and three sulpha drugs administered to her without a test to determine if she was allergic thereto? The doctor testified concerning the above as follows:

"Q. What about these 400,000 units you gave her?
"A. If she was sensitive to it, it could destroy her."

The doctor further testified that if Lois Byrd was allergic to penicillin it would be known "within five or ten minutes or from five to ten days, depending on whether it was immediate." The record discloses the patient received the penicillin on March 1, 1961, and died March 12, 1961.

The State, in its brief and oral argument, made much of the fact, and the majority opinion stresses that, as stated in the majority opinion, "[o]n one occasion the defendant walked nine or ten blocks through deep snow from his house to the home of the wife's parents carrying prepared orange juice in a glass jar. Within a few minutes after the deceased drank some of this orange juice she vomited and became worse, and, when she said she didn't want it, the defendant took it away with him." The State and the majority opinion would leave the inference the appellant was so determined to accomplish his wife's death that he would wade snow and brave all elements to accomplish that purpose. Let's look at the record to see what actually happened then, this being the evidence of the mother of Lois Byrd testifying as a witness for the State of Indiana, "[i]t was a bad snowy day and Warren walked over. She called him and

asked him to bring her false teeth and some orange juice and he came over and stayed for dinner. He gave her a glass of orange juice, but it didn't stay down and she said 'I shouldn't have drank that Donald Duck orange juice.' I told Warren and he said: 'I'll take this back if she doesn't want it' and he took it away with him."

The majority opinion also stresses the fact that a bottle of ant killer, containing a percentage of arsenic, was found behind the furnace in appellant's home. There is no evidence in the record as to how such bottle came to be placed where found or who placed it there.

Reference is made to testimony concerning appellant's refusal to take a lie detector test on advice of counsel. Such reference, at the trial and here, is inappropriate.

If the jury was convinced that Lois Byrd died of arsenic poisoning we are then confronted with the question, who administered the arsenic to Lois Byrd that caused her death? The burden was upon the State to prove beyond a reasonable doubt that the appellant did, and the jury evidently found that there was sufficient evidence, as a verdict of first degree murder was returned.

The case comes to this Court upon the record. The appellant insists there is not sufficient evidence to sustain the verdict, and, although this Court cannot weigh the evidence in arriving at its conclusion, if it finds there is no evidence contained in the record to sustain the verdict and judgment, then it not only has the power and authority, but it becomes its solemn duty to say so and reverse the judgment. *Osbon* v. *State* (1938), 213 Ind. 413, 13 N. E. 2d 223.

In the case at bar the appellant took the stand in his own behalf and denied poisoning his wife; the State failed to prove that the Dixie Cup in which the malted milk was contained was free from poison at the time it was delivered to the appellant for the use of the deceased. It is not shown in the record that the Dixie Cup in which the malted milk was contained, and from which the deceased is alleged to have drunk, is the same cup about which Dr. Forney testified. The record discloses two paper cups were the subject of the toxicologist's analysis, but neither was identified with the appellant nor were they introduced in evidence. Certainly that burden of proof must be required of the State.

> ".... If mere opportunity to murder is sufficient to convict then the life and liberty of many innocent people may be easily sacrificed. The law requires more than mere opportunity. It requires evidence to prove guilt beyond a reasonable doubt. It will not permit a mere possibility because of opportunity to take life or liberty. It does not require direct evidence, but if not direct, then the circumstantial evidence must be such as to exclude every other reasonable hypothesis except that of guilt." *Osbon* v. *State* (1938), 213 Ind. 413, 424, 13 N. E. 2d 223.

There is no motive disclosed by the record for the appellant to have poisoned his wife. On the contrary the record discloses, without dispute, a very satisfactory marital relationship existed between appellant and the deceased, the uncontradicted evidence being that they displayed great affection for each other.

This Court has said in the case of *Schusler* v. *The State* (1868), 29 Ind. 394, 395:

> ". . . That the deceased, one *John* Frederick, came to his death by violence is conclusively

shown; that the death was caused by the appellant is attempted to be established by circumstantial evidence. To sustain such a conviction, the facts proved must be susceptible of explanation upon no reasonable hypothesis consistent with the innocence of the person charged. Although the mysterious crime cannot be solved from the evidence, except upon the supposition of the defendant's guilt, still a conviction cannot follow. The life or liberty of a person cannot be legaly sacrificed on the ground that only by regarding him as guilty an explanation is afforded of the perpetration of a proved offense. . . ."

In the instant case there is a total lack of evidence to sustain the verdict and judgment.

".... [A]nd when it is thus found that there is not in the record evidence to sustain the finding of the jury and judgment of the court the cause should be reversed." *Osbon* v. *State* (1938), 213 Ind. 413, 428, 13 N. E. 2d 223.

It is only too apparent that the conviction of appellant was obtained and is here being affirmed on assumption, inference and opportunity.

The judgment should be reversed with instructions to grant the motion for a new trial.

Bobbitt, J., concurs.

NOTE.—Reported in 185 N. E. 2d 422.